520 F.2d 951
 89 L.R.R.M. (BNA) 3177, 77 Lab.Cas. P 11,095
 EAZOR EXPRESS, INC. and Daniels Motor Freight, Inc., Appellants,
v.
The INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN ANDHELPERS OF AMERICA, et al.,
Cross-Appellants.
 Nos. 74-1759 to 74-1762.
 United States Court of Appeals,
Third Circuit.
 Argued April 29, 1975.
Decided July 31, 1975.
Rehearing Denied Aug. 29, 1975.
 
 Tom P. Monterverde, Pelino, Wasserstrom, Chucas & Monterverde, Philadelphia, Pa., for Eazor Express, Inc. and Daniels Motor Freight.
 Sidney Dickstein, Dickstein, Shapiro & Morin, Washington, D. C., for Intern. Broth. of Teamsters.
 Eugene Green, Green, Schiavoni, Murphy & Stevens, Youngstown, Ohio, for Local Union 377.
 Ben Paul Jubelirer, Pittsburgh, Pa., for Local Union 249.
 Before MARIS, VAN DUSEN and GARTH, Circuit Judges.
 OPINION OF THE COURT
 MARIS, Circuit Judge.
 
 
 1
 Before us for decision are appeals by both the plaintiffs and the defendants hereinafter named from a final judgment entered by the United States District Court for the Western District of Pennsylvania in two consolidated civil actions brought under § 301 of the Labor Management Relations Act. 29 U.S.C.A. § 185. One of the suits was brought by Daniels Motor Freight, Inc. (herein "Daniels") and Eazor Express, Inc. (herein "Eazor") as plaintiffs, against the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (herein the "Teamsters International Union") and its Local Union No. 377 (herein "Local 377"), as well as against certain individuals not involved in these appeals, as defendants, and was originally filed in the Court of Common Pleas of Trumbull County at Warren, Ohio, promptly removed by the defendants to the United States District Court for the Northern District of Ohio, and subsequently transferred by the latter court to the District Court for the Western District of Pennsylvania. The other suit was brought by Eazor, as plaintiff, against the Teamsters International Union and its Local Union No. 249 (herein "Local 249"), as well as against certain other labor organizations not involved in these appeals, as defendants, and was filed in the District Court for the Western District of Pennsylvania. The suit brought originally in Ohio sought both injunctive relief and damages for losses alleged to have been suffered by the plaintiffs as the result of an unauthorized strike by certain of plaintiffs' employees who were members of Local 377. The suit brought in the Western District of Pennsylvania sought only damages for the losses alleged to have been suffered as the result of an unauthorized strike by certain of plaintiffs' employees who were members of Local 249. By order of the district court the actions were consolidated as a single action for trial and they will be treated as a single case for the purposes of our discussion.
 
 
 2
 The facts out of which the controversy arose may be summarized as follows. The unauthorized strikes giving rise to the litigation took place from August 20 to September 17, 1968 at Warren, Ohio and from August 21 to September 24, 1968 at Pittsburgh. Eazor and Daniels were both motor freight carriers, Eazor having a breakbulk commodities terminal in Pittsburgh and Daniels having a breakbulk terminal in Warren, Ohio. Prior to 1968 Eazor contracted to purchase all the stock of Daniels and during that year Eazor operated the Daniels business pursuant to an interim order of the Interstate Commerce Commission. Final approval of Eazor's acquisition of the Daniels stock was given by the Commission in 1970 and Daniels was actually merged into Eazor in 1972.
 
 
 3
 In 1968 the drivers and dock workers at Eazor's Pittsburgh terminal were members of Local 249 of the Teamsters International Union and the drivers, dock workers and garage employees at the Daniels terminal in Warren were members of Local 377 of that union. Eazor, Daniels, Local 249 and Local 377 were parties to the National Master Freight Agreement which was in force between April 1, 1967 and March 31, 1970. This agreement had been entered into between the National Over-the-Road and City Cartage Policy and Negotiating Committee (herein the "National Union Committee") of the Teamsters International Union and a corporation known as Trucking Employers, Inc., representing Eazor, Daniels and most other American motor freight carriers. To this master agreement there were various regional supplements binding upon certain employers and local unions. The Teamsters Joint Council No. 40 Freight Division Over-the-Road Supplemental Agreement and the Teamsters Joint Council No. 40 Freight Division Local Cartage Supplemental Agreement were the supplements binding on Eazor and Local 249. The Central States Area Over-the-Road Motor Freight Supplement with Ohio rider and the Central States Area Local Cartage Supplemental Agreement bound Daniels and Local 377. The district court held that the National Master Freight Agreement and its supplements also bound the Teamsters International Union, a disputed question in the case which we shall discuss later.
 
 
 4
 The supplemental agreements each contained substantially the following no-strike clause:
 
 
 5
 "The Unions[1] and the Employers agree that there shall be no strike, lockout, tie-up, or legal proceedings without first using all possible means of settlement, as provided for in this Agreement, (and in the National Agreement, if applicable,[2]) of any controversy which might arise."On August 17, 1968 Daniels discharged Roper, a garage employee and member of Local 377, and on August 19th Eckley, a road driver employee and union member, each for refusal of a work assignment. On the morning of August 20th meetings were held in Daniels' Warren terminal to attempt to resolve the grievances of Roper and Eckley arising from the termination of their employment. In attendance, among others, were Roper, Eckley, O'Neill, Vice-President and business agent of Local 377, and Clark, the terminal manager for Daniels. The meetings proved fruitless and in the afternoon Roper and Eckley began picketing the terminal. The members of Local 377 then walked off their jobs and the strike at Warren began. The next morning, August 21st, members of Local 377 from Warren appeared at the Eazor terminal in Pittsburgh and established a picket line there which the members of Local 249 employed by Eazor thereupon refused to cross.
 
 
 6
 It is conceded by all parties that Roper and Eckley did not exhaust the grievance procedure provided by the agreement and supplements in force between Local 377 and Daniels and that the strikes which began in Warren on August 20th and in Pittsburgh on August 21st were unauthorized by the unions and in direct violation of the no-strike clauses of the supplements to the National Master Freight Agreement to which they were parties. However, the local union stewards and committeemen at the Warren and Pittsburgh terminals took no steps to dissuade their fellow employees from striking or to induce them to return to work. On the contrary, they not only aided and abetted them but openly organized the strikes and led their members in conducting them.
 
 
 7
 The position of the unions, particularly Local 377, with respect to the strikes is less clear. There is no doubt that officers of the two local unions and of the Teamsters International Union repeatedly characterized the strikes as unauthorized and illegal and made a series of appeals, both written and verbal, to their striking members to return to work. Such appeals were made by O'Neill, the Vice-President and business agent of Local 377, among others, but the evidence is conflicting as to whether in fact O'Neill did not at the outset direct, or at least encourage, the walkout at Warren on August 20th. The district court found as a fact, however, that he had not done so, a finding which the plaintiffs assert was clearly erroneous and which we shall discuss later. It does not appear, however, that the unions took any action seeking to terminate the strikes more drastic or compelling than written and verbal urging of their members to return to work. No steps whatever were taken to remove or restrain the local union officers at the terminals, the stewards and committeemen, who were leading the strikers.
 
 
 8
 The strikes were characterized by an accelerating pattern of violence which persisted, despite efforts to enforce injunctions issued by the Court of Common Pleas at Pittsburgh[3] and the United States District Court at Cleveland[4] to control it. The violence included commandeering on the highway plaintiffs' drivers not involved in the strikes and compelling them to abandon their equipment, large scale destruction of Eazor equipment, threats of violence, and shootings and, finally, on September 16th an open assault by hundreds of persons on a convoy of Eazor trucks operated from the Pittsburgh terminal under police protection pursuant to a specific order of the Court of Common Pleas. Eleven of these persons, all members of Local 249, were arrested, convicted and imprisoned for criminal contempt by the Court of Common Pleas.
 
 
 9
 Within two or three days of the commencement of the strike at Warren, Daniels discharged Eugene Martin, the road steward, Bates, the city driver steward, and Merlin Martin and Arnold, union committeemen, and 26 other employees. On September 3d, urged by Judge Lambros, who was conducting the proceedings for a preliminary injunction in the United States District Court in Cleveland, the parties met to attempt a settlement of the strike. The union officials proposed that Daniels permit all the employees to return to work without penalty including Roper and Eckley whose reinstatement would be subject to determination through the grievance procedure. Daniels rejected this offer and indicated that it was unwilling to negotiate the status of the discharged employees until the employees not discharged returned to work. However, the evidence clearly shows that, contrary to the finding of fact by the district court which will be discussed later, shortly after this meeting the plaintiffs offered to reinstate all the Local 377 strikers who had been discharged except Roper, Eckley, the stewards and the committeemen, but this offer, which was recommended by O'Neill and the striking union members' counsel, was rejected by the strikers at Warren. On the same day Eazor at Pittsburgh discharged Gilmer, the road steward, McLallen, the road committeeman, and Jeffress, a member of Local 249. Daniels and Eazor then sent letters to all striking Local 377 and 249 members, respectively, other than Roper, Eckley, the stewards and the committeemen, offering them the opportunity to return to work without penalty if they returned on September 11th and with a three-day penalty for each day's participation in the strikes if they returned on September 16th. The strikers, however, rejected this offer and on September 17th Daniels sent letters of discharge to 157 striking employees at Warren and permanently closed its terminal there. On September 24th the striking members of Local 249 took a vote, for the first time by secret ballot, and voted to return to work. The next day, September 25th, they went back to work at the Pittsburgh terminal and the strike there was over. The strike at Warren had ended with the permanent closing of the terminal there on September 17th. Following the end of the strike at Pittsburgh, Gilmer, the road steward, McLallen, the road committeeman, and Jeffress, a union member, were permitted to return to work pending the conclusion of grievance procedure. By an arbitral award under that procedure the discharge of Gilmer and McLallen was upheld and that of Jeffress vacated.
 
 
 10
 The trial was bifurcated by the district court. The issue of the liability of the defendants for damages to compensate the plaintiffs for losses alleged to have been suffered as a result of the strikes was tried first. Following that trial the district court filed an opinion holding that while Local 377, Local 249 and the Teamsters International Union were not responsible for calling the illegal strike, they were, nevertheless, liable for some of its consequences because they breached their contractual obligation to use every reasonable means to terminate it. D.C.Pa.1973, 357 F.Supp. 158. Thereafter, the court held a trial on the issue of the amount of damages to be awarded. Extensive evidence on this subject was introduced and will be the subject of later discussion. Following the trial on this issue the court filed an opinion awarding to Eazor $325,120.84 against the Teamsters International Union and Local 249 and to Daniels $186,880.48 against the Teamsters International Union and Local 377. D.C.Pa.1974, 376 F.Supp. 841. Asserting that the court erred in excluding from its awards of damages large items of loss which they had proved, the two plaintiffs have appealed in each action. Appeals Nos. 74-1759 and 74-1761. Likewise, the three defendants have appealed in each action, urging that the court erred in imposing liability upon them and in any case in fixing the amount of the award of damages. Appeals Nos. 74-1760 and 74-1762.
 
 
 11
 We turn now to consider the issues raised by these appeals. The first question to which we address ourselves is raised by the Teamsters International Union which urges that the district court erred in holding that it was a party to the National Master Freight Agreement and its supplements. Those agreements were actually signed by the National Union Committee. The Teamsters International Union argues that in executing the contract the National Union Committee was acting merely as attorney in fact for the local unions. As to this, the district court said:
 
 
 12
 "In a technical sense, the International's latter position is unassailable. It was not a signatory to the agreement; rather its 'National Committee' was. The inquiry, then, must be into the relationship between the National Committee, the signatory to the agreements, and the International.
 
 
 13
 "The authority for the National Committee originated with a resolution of the Executive Board of the International. The authority was granted for the purpose of accomplishing national bargaining and national agreements, which were deemed by the Executive Board to be in the best interests of all the members of the International. The actual creation of the National Committee was by way of a resolution of a 'Conference of Representatives' from the International's local unions and joint councils. Finally, the National Committee was activated, at least in form, by virtue of a power of attorney from the International's unions.
 
 
 14
 "Notwithstanding the formalities surrounding its creation, the National Committee is intimately associated with the International. At all relevant times its members were appointed by the president of the International pursuant to authorization from the Executive Board; many of its members were contemporaneous members of the International's Executive Board; it was chaired by the president of the International; its funding was controlled by the International; and the International conducts the ratification vote its constitution requires after a national accord with its members' employers is reached. The National Committee has no status or shape as a labor organization independent of the International. It has no constitution or by-laws, and files no reports with the Department of Labor as it would be required to do if it were a labor organization. In short, it is organizationally and functionally an administrative arm of the International. Its sole purpose, to achieve national negotiations and national agreements, furthers the aims of the International. While it may act, in terms of the sophistries, on behalf of the local unions, in terms of the realities, it acts on behalf of the International." 357 F.Supp. at pp. 167, 168.
 
 
 15
 We fully agree with these conclusions. It is true that after all the signatures on the supplements to the National Master Freight agreement the following appears:
 
 
 16
 "This Agreement is approved as to form only by the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, and in doing so, the International Union assumes no liability whatsoever under this Agreement for the performance thereof or otherwise, and by such approval does not become a party to the Agreement.
 
 APPROVED:
 
 17
 INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA
 
 
 18
 Frank E. Fitzsimmons,
 
 
 19
 General Vice President"
 
 
 20
 As to this, it is sufficient to say that while it may well be that the Teamsters International Union did not become a party to the Agreement by executing the foregoing approval as to form, it is clear that it did become a party through the execution of the Agreement and supplements by its own administrative arm or agency, the National Union Committee. We need only add that we see no merit whatever in the contention of the Teamsters International Union that even though it must be regarded as a party to the agreement and its supplements through the relationship of the National Union Committee to it, the parties did not intend that it should have any obligation under the no-strike clauses in those supplements. The no-strike clauses were the fruit of negotiations between the motor carriers of the country and the International Union acting through its National Union Committee. They were perhaps the most important product of those negotiations so far as the motor carriers were concerned. It is inconceivable that it was not understood by all that by those clauses the International Union, as well as its various subordinate local unions, was undertaking to assure the carriers a period of three years of industrial peace.
 
 
 21
 As we have indicated in our statement of the facts, all of the supplemental agreements to which the Teamsters International Union and Locals 249 and 377 were parties contained virtually identical no-strike clauses. Under these clauses the unions agreed that there should be no strike against Daniels or Eazor without first using all possible means of settlement as provided by the grievance procedure set out in the agreement and supplements. Admittedly the grievance procedure was not exhausted prior to the strikes with which we are here concerned. The unions urge that these strikes were commenced wholly on the initiative of the plaintiffs' employees, admittedly all members of one or the other of the local unions, and were not authorized or called by the unions or by those officers of the unions who were authorized to take such action. There does not appear to be serious dispute as to this with respect to the Teamsters International Union and Local 249. But the plaintiffs urge that the evidence, fairly considered, established that the strike of Local 377 members at the Daniels terminal at Warren was, in fact, authorized and called by John J. O'Neill. Vice-President and business agent of the local union, who was the union officer authorized to do so. The unions concede that O'Neill did have such authority in Local 377, but assert that the evidence absolves him from any responsibility for calling or authorizing the strike and indicates, on the contrary, that he sought from the beginning to induce the strikers to end it. The issue thus raised was considered by the district court which found as a fact that O'Neill did not call the strike and that, in fact, he cautioned against it. The evidence on this issue was sharply conflicting and involved questions of credibility which were peculiarly for the trial judge to resolve. We have carefully considered that evidence. It would serve no useful purpose to review it in detail. We need merely say that we find ourselves unable to characterize the findings of the district court on this issue as clearly erroneous. The finding that Local 377 did not authorize or call the strike must, accordingly, be affirmed.
 
 
 22
 The district court held that necessarily implied in the unions' agreement that there should be no strike was an obligation on their part to use every reasonable means to bring to an end a strike begun by their members without their authorization. With this conclusion we agree. As the district court pointed out, collective bargaining agreements such as these impose a continuing day-to-day obligation on the parties to fulfill their terms in good faith. Curtiss-Wright Corp., Wright Aero. Div. v. NLRB, 3d Cir. 1965, 347 F.2d 61, 68; see Conley v. Gibson, 1957, 355 U.S. 41, 46, 78 S.Ct. 99, 2 L.Ed.2d 80. This is certainly true with respect to the obligation that there should be no strike pending the use of grievance procedure. Accordingly, in the case of an unauthorized strike against their employer by all the members of a union who are employed by that employer, their union may not disclaim responsibility for the losses suffered by the employer as the result of the strike unless and until it has exhausted all reasonable means within its power to bring that unlawful action to an end. A no-strike agreement would be illusory indeed were a union to be permitted to avoid all responsibility under it for the duration of a prolonged strike which was being carried on by the concerted action of all its members employed in the struck operation, merely because the strike was not initially authorized or called by the union as an organization or by those of its officers who were specially empowered to do so. Rather than to construe a contract as producing such a result, the courts will favor a construction making the mutual promises binding and giving the contract legal effect. 1A Corbin on Contracts 8-9; 3 Corbin on Contracts 168-171; 17 Am.Jur.2d 452.
 
 
 23
 In Penn Packing Co., Inc. v. Amalgamated Meat Cutters, Local 195, 3d Cir. 1974, 497 F.2d 888, 891, this court held that by giving a no-strike pledge substantially similar to those here involved the union had committed itself to use its best efforts to end a work stoppage as soon as practicable. In that case we held that it had done so and thereby had discharged its no-strike obligation.
 
 
 24
 United Construction Workers v. Haislip Baking Co., 4 Cir., 223 F.2d 872, cert. denied, 1955, 350 U.S. 847, 76 S.Ct. 87, 100 L.Ed. 754, is urged by the defendants as authority to the contrary. But in that case the collective bargaining agreement did not contain an express no-strike clause and while the court there held that a strike which was begun without following the grievance procedure was necessarily a breach of the agreement for the settlement of grievances by such procedure, it concluded that there was nothing in the contract making the defendant union liable for such an unauthorized strike by its members or requiring that it take any action with regard to it. We do not read the Haislip case as authority for the defendants' position here.
 
 
 25
 It is true, of course, that the courts may not remake the parties' contracts and may declare an implied obligation to exist only when there is a satisfactory basis in the express provisions of the agreements which make it necessary to imply certain duties and obligations in order to effectuate the purposes of the parties. Kellogg Co. v. NLRB, 6 Cir., 457 F.2d 519, cert. denied, 1972, 409 U.S. 850, 93 S.Ct. 58, 34 L.Ed.2d 92. To find such an implied obligation in a labor contract is not without precedent, however. Indeed the Haislip case, on which the defendants rely, is an example. And the Supreme Court has similarly held, in a case where arbitration was the means chosen by the parties in their contract to settle a labor-management dispute, that an agreement not to strike pending arbitration was necessarily implied and that the union involved which was engaging in a strike during the pendency of the arbitration proceedings was bound by and had breached that implied agreement. Teamsters Union v. Lucas Flour Co., 1962, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593. The decision was grounded on traditional contract law and "Even more in point", said the Court, on the "basic policy of national labor legislation to promote the arbitral process as a substitute for economic warfare." 369 U.S. p. 105, 82 S.Ct. at 578. And see Amalgamated Meat Cutters & Butcher Workmen of America, Local 195 v. Cross Brothers Meat Packers, 3 Cir. 1975, 518 F.2d 1113.
 
 
 26
 The no-strike clauses in the collective bargaining agreements here involved are basic to the agreements. As stated in the Senate report recommending passage of the Labor Management Relations Act, "the chief advantage which an employer can reasonably expect from a collective agreement is assurance of uninterrupted operation during the term of the agreement." S.Rep.No.105, 80th Cong., 1st Sess. (1947) p. 16. Moreover, the no-strike clauses were binding on the individual union members on whose behalf the unions signedtheagreement,[5] as well as on the unions as organizations and on their officers. NLRB v. Allis-Chalmers Mfg. Co., 1967, 388 U.S. 175, 180, 87 S.Ct. 2001, 18 L.Ed.2d 1123. It is perfectly clear that the parties, both the unions and their members as well as the employers, intended that during the term of the agreements there should be no strikes or work stoppages pending exhaustion of the grievance procedure.
 
 
 27
 The unions point to two provisions of the agreements which they contend limit their liability for unauthorized strikes. The first of these is Article 4 of the National Master Freight Agreement which is applicable to both Locals 377 and 249, as well as to the Teamsters International Union, and which contains the following pertinent provisions:
 
 
 28
 "Article 4. Stewards
 
 
 29
 "Job Stewards and alternates have no authority to take strike action, or any other action interrupting the Employer's business, except as authorized by official action of the Local Union. The Employer recognizes these limitations upon the authority of job stewards and their alternates, and shall not hold the Union liable for any unauthorized acts. The Employer in so recognizing such limitations shall have the authority to impose proper discipline, including discharge, in the event the shop steward has taken unauthorized strike action, slowdown or work stoppage in violation of this Agreement."
 
 
 30
 The unions urge that this section of the agreement absolves the unions from any liability for unauthorized strike action. We are satisfied from the context, however, that the phrase at the end of the second sentence "any unauthorized acts" for which the employer may not hold the union responsible refers only to such acts by job stewards and their alternates and does not refer to unauthorized strike activities by other members of the local union.
 
 
 31
 The other provision limiting union liability for unauthorized strike action appears in Article 43, Section 2, of each of the two supplemental agreements which bind only Local 377 and the Teamsters International Union. That section provides in pertinent part:
 
 
 32
 "Section 2. It is further mutually agreed that the Local Union will, within two weeks of the date of the signing of this Agreement, serve upon the Employer a written notice, which notice will list the Union's authorized representatives who will deal with the Employer, make commitments for the Union generally, and in particular have the sole authority to act for the Union in calling or instituting strikes or any stoppages of work, and the Union shall not be liable for any activities unless so authorized. . . . It is further agreed that in all cases of an unauthorized strike, slow-down, walk-out, or any unauthorized cessation of work in violation of this Agreement, the Union shall not be liable for damages resulting from such unauthorized acts of its members.
 
 
 33
 "While the union shall undertake every reasonable means to induce such employees to return to their jobs during any such period of unauthorized stoppage of work mentioned above, it is specifically understood and agreed that the Employer during the first twenty-four (24) hour period of such unauthorized work stoppage shall have the sole and complete right of reasonable discipline short of discharge, and such Union members shall not be entitled to or have any recourse to any other provisions of this Agreement. After the first twenty-four (24) hour period of such stoppage, and if such stoppage continues, however, the Employer shall have the sole and complete right to immediately discharge any Union member participating in any unauthorized strike, slow-down, walk-out, or any other cessation of work, and such Union members shall not be entitled to or have any recourse to any other provision of this Agreement. . . ."
 
 
 34
 While the limitation of union liability for "any activities" contained in the first sentence of this section of these supplemental agreements will be seen to be limited by the context to activities "in calling or instituting strikes or any stoppages of work," the reference in the next-quoted sentence to "such unauthorized acts of its members" does refer to all acts involved in an unauthorized strike, slow-down, walk-out, or any other unauthorized cessation of work in violation of the agreement.
 
 
 35
 By these restrictions upon the liability of the unions the employers were undoubtedly bound. But they involved only liability for the unauthorized strike action of job stewards and individual union members. They did not relate to or purport to relieve the unions from their own specific promise "that there shall be no strike . . . without first using all possible means of a settlement, as provided for in this Agreement, of any controversy which might arise." This promise was binding on the unions as such, as well as on the union members, and it did not necessarily involve assumption by the unions of responsibility for unauthorized strike action of the individual members. While it was not a "no fault" guarantee against any work stoppage, Penn Packing Co., Inc. v. Amalgamated Meat Cutters, Local 195, 3 Cir. 1974, 497 F.2d 888, 890, it did involved the obligation of the unions, which was necessarily implied in their promise, not only not to call a strike themselves but also to take timely steps to end such an unauthorized strike by employing any and all such reasonable means at their command as might be needed to get their members back to work. It was the breach of this obligation by the unions, not any responsibility for the particular unauthorized actions of their members, which generated liability on their part.
 
 
 36
 Moreover, it will be observed that the existence of this implied obligation on the part of the unions was recognized in the supplemental agreements to which Local 377 and the Teamsters International Union were parties from which we have quoted above. The second paragraph of section 2 of article 43 of those agreements opens with the following preliminary clause:
 
 
 37
 "While the Union shall undertake every reasonable means to induce such employees to return to their jobs during any such period of unauthorized stoppage of work mentioned above, it is specifically understood . . ."
 
 
 38
 As indicated by the syntactical composition of the parts as well as by the sense, the primary purpose of the second paragraph of section 2 is to confer upon the employer the right to discipline and, after 24 hours, to discharge union employees who participate in a contract-breaking strike. The preliminary subordinate clause introduced by the conjunction "while" and just quoted is in effect a recital of the unions' continuing obligation, which, as we have seen, is implied in their no-strike pledge, to employ all reasonable means to end such a strike. The reference in the clause to an "unauthorized stoppage of work mentioned above" is a recognition that this obligation exists notwithstanding the unions' release from liability for its members' unauthorized strike activities which is contained in the immediately preceding paragraph. Moreover, the clause functions here as a drafting device to make it clear that the right which the paragraph confers on the employer does not operate to abrogate that union obligation, which is to continue side-by-side with the employer's right. Thus the recital is a recognition of the unions' implied obligation continuously to endeavor to end an unauthorized strike. Since the obligation is one which is implied from the no-strike clause as necessary for the fulfillment of the obligation of that clause, it is merely recognized as existing, but not created, by the recital of it in the preliminary clause of the paragraph from the Central States Area Local Cartage Supplemental Agreement which we have quoted. And since the no-strike clause appeared in all the supplemental agreements involved in this case it necessarily follows that the unions had a similar obligation under the agreements applicable to each of them, respectively, to use all reasonable means to end a strike existing in violation of that clause, regardless of the presence or absence of a recital of the obligation in the agreements to which a particular union was a party. Thus the obligation of Local 249 and the Teamsters International Union to endeavor to end the strike at Pittsburgh was identical with the obligation of Local 377 and the Teamsters International Union to do so at Warren.
 
 
 39
 We are satisfied that the continuing responsibility of the unions under the no-strike clause and the recognition of the consequent implied obligation on their part to use all available means to terminate an unlawful strike begun by their members, effectuates the intent of Congress in enacting section 301(a) of the Taft-Hartley Act to promote and make effective agreements not to strike. S.Rep.No.105, 80th Cong., 1st Sess. (1947) pp. 16-18. Moreover, a construction of the no-strike clause as impliedly obliging the unions to use their powers to implement it is responsive to the directive of the Supreme Court to the lower federal courts in deciding suits under section 301(a) of the Labor Management Relations Act to fashion a body of federal law in accord with the Congressional intent and with the basic goal of Congress to promote industrial peace. Textile Workers Union v. Lincoln Mills, 1957, 353 U.S. 448, 456-457, 77 S.Ct. 912, 1 L.Ed.2d 972.
 
 
 40
 We think that there is an additional basis for upholding the finding of union liability in this case. This is the so-called mass action theory. When all the members of a union employed by a given employer engage in a concerted strike not formally authorized by the union, as happened here, many courts hold the union responsible on the theory that mass action by union members must realistically be regarded as union action. The premise is that large groups of men do not act collectively without leadership and that a functioning union must be held responsible for the mass action of its members. Wagner Electric Corp. v. Local 1104, Int. U. of E., R. & M. W., 8 Cir. 1974, 496 F.2d 954, 956; Vulcan Materials Co. v. United Steelworkers of America, 5 Cir. 1970, 430 F.2d 446, 455, cert. denied, 1971, 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247; United Textile Workers of America v. Newberry Mills, Inc., W.D.S.C.1965, 238 F.Supp. 366, 373; Portland Web Pressmen's Union v. Oregonian Publishing Co., D.Or., 188 F.Supp. 859, 866, aff'd on other grounds, 9 Cir. 1960, 286 F.2d 4, cert. denied, 1961, 366 U.S. 912, 81 S.Ct. 1086, 6 L.Ed.2d 237; United States v. International Union, U.M.W. of A., D.C.D.C.1948, 77 F.Supp. 563, 566-567, aff'd on other grounds, 85 U.S.App.D.C. 149, 177 F.2d 29, cert. denied, 1949, 338 U.S. 871, 70 S.Ct. 140, 94 L.Ed. 535.
 
 
 41
 In instances where, as here, in the case of the job stewards and committeemen, union functionaries have instigated, participated in or actively encouraged members to continue their unauthorized work stoppage, the courts have also based union liability for the resulting damage to the employer on the common law of agency, expressly made available to the parties to a breach of contract suit by § 301(b) and (e) of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 185(b) and (e). Wagner Electric Corp. v. Local 1104, Int. U. of E., R. & M. W., 8 Cir. 1974, 496 F.2d 954, 956; Vulcan Materials Co. v. United Steelworkers of America, 5 Cir. 1970, 430 F.2d 446, 456, cert. denied, 1971, 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 1247; Lewis v. Benedict Coal Corp., 6 Cir. 1958, 259 F.2d 346, 351-352, modified on other grounds, 1960, 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442. See also General Truck Drivers, C. W. & H., Local No. 5 v. NLRB, 5 Cir. 1969, 410 F.2d 1347. That a principal may ratify, by subsequent conduct inconsistent with repudiation, an agent's unauthorized acts earlier disaffirmed by the principal may well also be a theory of liability which might be applied under the facts of this case in order to implement federal labor policy and regardless of the contractual limitations upon the authority of the unions' subordinate officials, the stewards and committeemen. See Restatement 2d of Agency, § 8A. Moreover, it will be observed that courts upholding liability in these cases, whether upon the mass action theory or agency or on both, have stressed the failure of the unions involved to take steps, other than written and oral exhortation, speedily to terminate illegal strikes as an indication of passive acquiescence in the strike. Wagner Electric Corp. v. Local 1104, Int. U. of E., R. & M. W., 8 Cir. 1974, 496 F.2d 954, 956; Vulcan Materials Co. v. United Steelworkers of America, 5 Cir. 1970, 430 F.2d 446, 457, cert. denied, 1971, 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247; United Textile Workers of America v. Newberry Mills Inc., W.D.S.C.1965, 238 F.Supp. 366, 372.
 
 
 42
 In the present case the district court, having concluded that the unions were obligated to use all reasonable means to terminate the strikes, found that they had not fulfilled their obligation in this regard. We cannot hold this finding to be erroneous. The record clearly establishes that the sole means employed by the unions to endeavor to end the strikes was the use of the spoken and written word in the form of declarations of the illegality of the strikes, instructions to return to work and persuasion and cajolery to that end, all of which the striking union members rejected out of hand. It is clear, however, as the district court found, that in the ugly and violent situation which existed at Warren and Pittsburgh mere rhetoric was not enough. No stronger measures from the unions' arsenal were ever employed, however, although they were available. Thus no effort was made to discipline or remove the job stewards and committeemen who were organizing and leading the strikes,[6] to suspend or fine the striking union members, to place the local unions in temporary trusteeship, or even, until the very end of the strike, to take the votes of union members by secret ballot. Stronger measures, such as these, were indicated, were available and should have been taken to the extent necessary.
 
 
 43
 The unions rely on a statement by the district court that "Whether or not any of the untaken tacks or unsummoned measures would have produced the cessation of the strike is unknowable." Of course no human reactions can be known with certainty before they occur. But whether the use of the stronger measures which were available would actually have been successful in ending the strikes is beside the point. It was highly probable that they would have been since the use of only one of them in an earlier strike by a Teamsters local against Eazor had been sufficient to end it. The point here is that the unions were contractually obliged to carry out their agreement that there should be no strike by employing all reasonable means available to them to seek to end the existing unauthorized strikes and this they failed to do. Having thus chosen not to try out those stronger measures which were available, indicated, and probable of success they cannot be heard to say that such measures, if employed, would not have been successful in ending the strikes in this case and that, accordingly, it was not necessary to try them in order to absolve the unions of responsibility for the results of the strikes.
 
 
 44
 We conclude that the district court did not err in holding that Locals 377 and 249, as well as the Teamsters International Union, each had an obligation to use all reasonable means to end the strikes in which their members were involved, and that they all failed to fulfill this obligation and thereby became liable because of their own breach of contract for the damages resulting from the strikes which they made no adequate effort to end. It is not contended that Local 249 had any responsibility to seek to end the strike against Daniels at Warren. Eazor does contend, however, that Local 377 was obligated to seek to terminate the strike at Pittsburgh as well as that at Warren since the Pittsburgh strike was triggered by Local 377 members who came to Pittsburgh and established the picket line there. We cannot accept this proposition. The strikers at Pittsburgh were, of course, not members of Local 377 and it is, therefore, clear that Local 377 was not in a position to take effective measures to get them back to work, such as it could and should have employed with respect to its own members at Warren. Nor did Local 377's no-strike pledge run to Eazor or its operations at Pittsburgh. It might, perhaps, be contended that, although the strike at Pittsburgh actually involved local grievances there, it was triggered by the strike of Local 377 members at Warren, and that it was, therefore foreseeable that strike action at Warren might cause losses to Eazor at Pittsburg as well as to Daniels at Warren. Based on this premise the argument might be made that Local 377, although not contractually obligated to Eazor, became responsible to it for the losses at Pittsburgh on some non-contractual theory. However, since it does not appear that such a theory was presented either to the district court or to us, we do not consider it.
 
 
 45
 The question remains as to the point in time when the liability of the unions arose. Having found that the unions had not called the strikes, the district court held that they were entitled to a reasonable period of time after the inception of the strikes in which to take the action required of them. The district court fixed this period of time as the first 48 hours after the commencement of the strike at Warren. The strike at Warren began at approximately 3:30 p.m. on August 20th. The Pittsburgh strike began on the morning of August 21st. The district court decided that the liability of all the unions arose simultaneously two days after the commencement of the strike at Warren. This decision was based on its finding that all the unions knew of the strikes by the morning of August 21. Having made similar contemporaneous verbal efforts to persuade the men to return to work, which proved wholly ineffective, they all knew within that period of time that stronger measures were required and they should have employed them at once. Technically, the court granted Local 377 a period of grace somewhat less than 48 hours and longer than that awarded to Local 249. This was permissible under the facts and circumstances test which the court decided should govern the extent of the period and which it applied in this instance. The parties do not seriously contest the reasonableness of this period of time, given the facts and circumstances of the strikes and the determination of the district court with respect thereto. We agree with the district court's determination in this regard which we think was a reasonable one.
 
 
 46
 We conclude that the Teamsters International Union and Local 377 became liable to Daniels for the damages proximately caused by their failure under their no-strike pledge to use all reasonable means to end the unauthorized strike at Warren, and that the liability arose 48 hours after the inception of the strike and continued until it ended with the closing of the Warren terminal. Likewise, we conclude that the Teamsters International Union and Local 249 became liable to Eazor for the damages proximately caused by their failure under their no-strike pledge to use all reasonable means to end the unauthorized strike at Pittsburgh, and that the liability arose 48 hours after the inception of the strike at Warren and continued until it ended when the striking employees returned to work. Eazor urged in the district court that the Teamsters International Union and Local 377 were also liable to it with respect to the strike at Warren, basing this contention on the ground that it was the equitable owner of Daniels under the stock purchase agreement and was actually operating the Daniels business as part of its own at the time of the strike. The district court rejected this contention. On appeal Eazor does not seriously press it since as the result of the later actual merger of Daniels into Eazor a judgment now awarded to Daniels will inure to the benefit of Eazor in any event. It is, accordingly, unnecessary to consider this contention further and for the purposes of this case we have regarded Daniels as the employer at Warren and Eazor the employer at Pittsburgh.
 
 
 47
 Having considered and affirmed the district court's determination of liability we pass to the question of damages. On this question both plaintiffs and defendants assert error on the part of the district court. The plaintiff employers urge that the court unduly restricted them in their proof of damages and in the elements of damage recoverable and that it erred in holding that they failed to mitigate their damages. The defendant unions, on the other hand, argue that the plaintiffs failed to prove that they were damaged by the defendants' breach and that in any event the damages awarded by the court were excessive. Before discussing these contentions, however, we must consider the measure of damages to be applied in the facts of this case.
 
 
 48
 As we have already indicated, the liability which the unions incurred was for the damages proximately caused by the breach of their contractual obligation to use every reasonable means to end the strikes. This breach took place at the expiration of two days after the commencement of the strike at Warren, when, as the district court found, it appeared that sufficient time had elapsed for the unions to take reasonable measures to end the strikes but they had failed to employ any measures more potent than mere rhetoric. We think that the measure of damages recoverable in this case is the actual loss sustained by each plaintiff as a direct result of the breach and which may reasonably be supposed to have been in the contemplation of the parties as the probable result of such a breach at the time the agreement was made. This is the traditional criterion for the ascertainment of damages for breach of contract which the district court rightly held was to be employed here. 11 Williston on Contracts, 3d Ed. Jaeger 1968, p. 323. The defendant unions argue that the measure of damages should not be the loss caused by the continued strikes but rather the loss caused by the failure of the unions to employ all reasonable measures within their power to end them. We agree, however, with the district court that in the circumstances of this case the two were identical in extent.
 
 
 49
 The unions' no-strike pledge was not an aleatory promise conditional upon the happening of a fortuitous event in the future. It was rather an undertaking that there should be no strike by union members during the term of the agreement in violation of the no-strike pledge. Such a strike, which would necessarily have to be carried on by union members, could hardly be described as a fortuitous event. Rather it would necessarily be an event generated within the unions' own constituency, whether with or without the approval of the union organizations, a situation with which the unions were obviously competent to deal as they had agreed to do. In view of the arsenal of powerful measures available to them it is highly probable that the unions could have ended the strikes promptly, given the will to do so. We think that the plaintiffs were entitled to rely upon the unions' doing so, this being the only way in which, in the case of unauthorized strikes such as these, they could perform their no-strike promise. To hold otherwise would make a hollow mockery of the unions no-strike pledge and would leave the plaintiffs without any remedy in damages if, as it has been held, the individual union members are not answerable in damages for illegal strike activity. Sinclair Oil Corp. v. Oil, Chemical and Atomic Workers International Union, 7 Cir. 1971, 452 F.2d 49.
 
 
 50
 If the unions had made a showing of the use of strong and punitive measures without result it would have been for the district court to determine whether they had relieved themselves from liability by fulfilling their obligation to exhaust all reasonable measures available to them to end the strikes. In determining whether available measures were reasonable the sole test would be whether they were within the power of the unions to employ and might be likely to be effective to end the strikes. Any possible negative effect upon the unions themselves and their internal organization, although much stressed by the defendants here, would not have been relevant. For it was the restoration of industrial peace with the plaintiffs, not their own well being, which the defendant unions were obligated by their no-strike pledges to seek. Here, as we have seen, the record fully supports the court's finding that the unions used only rhetoric and wholly abstained from the use of any more powerful measures, thus, in practical effect, acquiescing in the strike situation. Under these circumstances we are clear that they cannot now be heard to urge that the measures to which they did not resort would not have proved successful. It was the possibility of loss from a continuing strike, and not of some theoretical aleatory loss, which must reasonably be supposed to have been in the contemplation of the parties to these collective bargaining agreements. Moreover, the defendant unions were answerable in damages for the loss where, as here, their breach was a substantial factor in causing the plaintiffs' injury, Krauss v. Greenbarg, 3d Cir., 137 F.2d 569, 572, cert. denied, 1943, 320 U.S. 791, 64 S.Ct. 207, 88 L.Ed. 477, even though the acts of others were contributing factors also, as, for example, the actions of the strikers in this case. Southern National Bank v. Crateo, Inc., 5 Cir. 1972, 458 F.2d 688, 697; Krauss v. Greenbarg, 3d Cir., 137 F.2d 569, 572. We conclude that the measure of damages in this case is the loss sustained by each plaintiff as the result of the continuance of the strikes after the first two days of the strike at Warren.
 
 
 51
 There was a great deal of evidence offered on the subject of the amount of the plaintiffs' losses resulting from the strikes. The evidence included the plaintiffs' accounting records, testimony by accountants with respect thereto, the plaintiffs' corporate reports and much other material. Differing accounting theories for establishing the losses were presented by the accountants who testified and the evidence was in many respects sharply conflicting. We will not here attempt to outline the conflicting figures and theories with respect to them which the record presents, since it would serve no useful purpose to do so. The district court threaded its way through this maze and found as a fact that the total aggregate loss suffered by the two plaintiffs during the period of the strikes was $1,079,332.00. We need note here only that the defendant Local 377 urges that the plaintiffs failed to sustain their burden of proof by the evidence which they presented of the consolidated losses of Daniels, Eazor and Mahoning Equipment Company, an affiliate which owned and furnished much of the equipment used by Daniels and Eazor. Local 377 contends that Mahoning's figures should not have been included. We think, however, that in the circumstances of this case these figures were relevant. All the defendants urge that the loss established by the evidence was only $696,255.00 at the maximum and possibly as little as $208,375.00. Our consideration of the record satisfies us, however, that there was support in the evidence for the finding of the district court that the plaintiffs' total loss was $1,079,332.00 and we cannot say that this finding was erroneous. We, accordingly, adopt that figure as the district court did, as a starting point for the discussion of the damages.
 
 
 52
 The plaintiffs urge that the district court erred in failing to include in its determination of their losses attributable to the strike the profits which they alleged they lost both during and after the strike. The court agreed that the plaintiffs would have been entitled to have had such lost profits included if they had proved that such profits would have been earned absent the strike. The court found from the evidence, however, that such profits would not have been earned.
 
 
 53
 The plaintiffs claimed $80,719.00 in lost profits during August and September of 1968, the strike period, and $1,295,907.00 for profits lost following the strike in 1968, 1969 and 1970 as evidenced by a reduction in the volume of freight. Lost profits resulting from a breach of contract must be proved with reasonable certainty both as to fact and amount. McBrayer v. Teckla, Inc., 5 Cir. 1974, 496 F.2d 122, 126; McCormick on Damages, 1935, p. 99. Ordinarily, evidence of sales before and after a breach of contract is acceptable proof showing the amount of revenue and net profits lost by the plaintiff as a result of the breach. McBrayer v. Teckla, Inc., 496 F.2d 122, 127; Flexitized, Inc. v. National Flexitized Corp., 2 Cir. 1964, 335 F.2d 774, 779, cert. denied, 1965, 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799. However, Eazor's and Daniels' income picture during the years 1966 to 1970 does not indicate any consistent earning power or any upward trend in profits. Eazor's earnings in 1966 and 1967 had fallen below its earnings of previous years. The integration of the operations of Daniels with those of Eazor in late 1967 may have caused the increased profits both plaintiffs experienced in the first two quarters of 1968. Whether this indicated a trend or was merely a temporary outcome of the new corporate arrangement is problematical. Eazor experienced a loss in July of 1968. The occurrence of the illegal strike in the last two months of the third quarter of 1968 no doubt accounted for the large deficit Eazor sustained in that period. Eazor's comparative income statement for the last five months of 1968 shows a recoupment of revenue and profits in October of 1968. In 1969 Eazor's revenue and net earnings decreased and it operated with a deficit throughout 1969 and 1970.
 
 
 54
 The plaintiffs urge that the district court erroneously required them to produce "conclusive proof" of their claimed loss of profits during the period of the strike. It is sufficient as to this to say that we do not read the court's opinion as so holding. The court's use of the phrase "conclusive proof" referred to the necessity for the plaintiffs to demonstrate with reasonable certainty that they would have made a profit during the relevant period as well as the amount of it. This, the court said, and we agree, they had failed to do. We think that the phrase was intended merely to indicate that the plaintiffs were required to meet the standard of proof laid down in McBrayer v. Teckla, Inc., 5 Cir. 1974, 496 F.2d 122, 126, cited above.
 
 
 55
 The claim for lost profits in the period following the strike was based largely on the contention that these would have been earned on business which the plaintiffs lost as the result of the strike. But here again the evidence was sharply conflicting. Indeed an Eazor annual report to stockholders which was in evidence stated that after the strike the company's operations quickly returned to normal "and we have regained all of our customers." We are satisfied from our examination of the record that the findings of the district court with respect to alleged lost profits are not clearly erroneous and must be sustained.
 
 
 56
 The defendants contended and the district court held that it was the duty of the plaintiffs to mitigate the damages resulting from the defendants' default by taking steps calculated to end the strike and by refraining from taking any action which would aggravate the situation and increase the damages. The court held that the plaintiffs had failed to comport themselves in accordance with the legal standard applicable but had instead adhered to a hard-line course of retribution and obstinacy. It has been held that a plaintiff in a section 303 suit has the duty to minimize damages if it is reasonably possible to do so. Vulcan Materials Co. v. United Steelworkers of America, 5 Cir. 1970, 430 F.2d 446, 458. We think, however, that in the present case the plaintiffs did all that could reasonably be required of them to end the strike and thereby to mitigate the damages and that the district court clearly erred in deciding to the contrary.
 
 
 57
 In the case of In re Kellett Aircraft Corp., 3 Cir. 1950, 186 F.2d 197, this court, considering and rejecting a claim that the buyer should have mitigated the damages in a claim for the breach of a contract for the fabrication of shower cabinets, said:
 
 
 58
 "Whether or not the buyer's obligation to mitigate damages has been discharged depends on the reasonableness of its conduct. In this connection, reasonable conduct is to be determined from all the facts and circumstances of each case, and must be judged in the light of one viewing the situation at the time the problem was presented. Where a choice has been required between two reasonable courses, the person whose wrong forced the choice can not complain that one rather than the other was chosen. The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter. One is not obligated to exalt the interests of the defaulter to his own probable detriment." 186 F.2d at pp. 198-199.
 
 
 59
 We think that the doctrine of mitigation of damages has a limited application to situations in which a union or its members have breached a no-strike agreement by carrying on a strike in violation of the agreement.[7] The limitations which we suggested and applied in the Kellett Aircraft case upon the duty of the injured party to mitigate damages apply with even greater force to such a situation. The breach of contract involved in such a strike is quite different in purpose and effect from the breach of an ordinary commercial contract. For its purpose ordinarily, as in the case before us, is to extort by the economic pressure of the loss resulting from a work stoppage, a tactic of economic warfare, benefits from the employer which were denied to the union and its members by the collective bargaining agreement to which they have solemnly assented. Thus it is economic injury to the employer which the strikers contemplate as the means for securing the ends they seek. Under these circumstances the employer may hardly be required to mitigate the damages resulting from that injury by taking steps which amount to a capitulation to the demands of the strikers for benefits which the agreement has denied them. Nor, in our opinion, may the employer be required, upon the theory of mitigation, to take steps which he may reasonably regard as likely to have the effect of encouraging the strikers to repeat such contract-breaking breaches of industrial peace in the future. The unions cannot have it both ways; they cannot sit by without taking appropriate action while a mass of their members wrongfully imposes economic loss on an employer through an unlawful strike in order to secure benefits not granted by their labor agreement and then claim, when called upon to compensate the employer for the resulting loss, that he should have minimized it by acceding to the strikers' demands and thereby ending the work stoppage. Compare Vulcan Materials Co. v. United Steelworkers of America, 5 Cir. 1970, 430 F.2d 446, 458.
 
 
 60
 It is to prevent just such an interruption of industrial peace between labor and management as took place in the present case that a no-strike clause binding on the union and its members is included in a collective bargaining agreement. As we have seen in the case before us such a clause not only commits the union not to call a strike itself, but also, if its members carry on an unauthorized strike, to assure the continuance of industrial peace by taking such steps as are within its power to get them back to work. To the same end, in such an agreement the employer may be given the right, as was done by the agreements in this case, to endeavor to terminate an unauthorized strike itself by discharging, without regard to existing grievance procedure, union employees who were engaging in such an illegal strike. Other than recourse to the injunctive processes of the courts this appears in fact to have been the only weapon which the plaintiffs in this case had available to them to use to end the strike. Barring its use or the intervention of the courts their only alternatives appear to have been persuasion by the written and spoken word, which proved wholly ineffective, sitting out the strike with its consequent further economic loss, or capitulation to some or all of the illegal demands of the striking employees.
 
 
 61
 In the present case the district court made the finding that Daniels,[8] which had discharged the employees who were the leaders of the strike at Warren, refused to agree to an offer made by union representatives on September 3d to settle the strike by having all the strikers, including the strike leaders who had been discharged for their illegal strike activity, return to work and submit to the grievance procedure the question whether the latter had been properly discharged. The court pointed out that on September 9th Eazor discharged five strike leaders at Pittsburgh, the stewards and committeemen of local 249, and on the same day "proposed that all remaining employees, not including those it proposed to put on a three-month suspension, return to work with the same condition attached that the status of discharged employees was final and not subject to arbitration" under the grievance procedure. The court made the finding that Daniels and Eazor failed to mitigate damages on September 9th on which date, the court said, Daniels had refused the unions' settlement offer of September 3d.
 
 
 62
 We think, however, that the defaulting unions cannot be heard to urge that Daniels and Eazor, the injured parties, should have given up their right to maintain the outright discharge of the strike leaders, and have taken them back pending the outcome of grievance procedure, in an effort to settle the strikes, instead of insisting on their discharge as they had a contractual and legal right to do. Labor Board v. Sands Manufacturing Co., 1939, 306 U.S. 332, 344, 59 S.Ct. 508, 83 L.Ed. 682. It was certainly not unreasonable for the plaintiffs to elect to insist on employing this, their most potent measure, to end the strike, particularly in view of the record of previous wildcat strikes by members of Locals 377 against Daniels and 249 against Eazor which the evidence in this case discloses. For the alternative was virtually to capitulate to the strikers' demands by taking back all the striking employees whom they had lawfully discharged which, under the agreement, they were not contractually bound to do. The latter course might well have ended the strike in a way which Eazor was reasonably entitled to believe, as its president testified, would only lead to similar unlawful action by its union employees in the future.
 
 
 63
 As the district court said, these parties were engaged in a hard-nosed business. The strikers' conduct was certainly hard-nosed for not only was it in the teeth of their no-strike pledge but it was characterized by widespread violence and intimidation. We repeat that we do not think that under these circumstances the contract breakers, the unions and their striking members, can be heard to complain that Daniels and Eazor chose to exercise and maintain the right which these very unions had given them to seek to end the strikes by discharging and refusing to reinstate the strike leaders, rather than the possible alternative which the plaintiffs could have regarded as virtual capitulation to the unlawful demands of the wildcat strikers. As we pointed out in the Kellett Aircraft case, the fact that the latter course would have been more advantageous to the strikers is not the test. As we there said: "One is not obligated to exalt the interests of the defaulter to his own probable detriment." We conclude, therefore, that the district court imposed too strict a mitigation standard upon the plaintiffs.
 
 
 64
 Our examination of the record satisfies us, moreover, that the district court erred in its finding, upon which the court's conclusion of failure to mitigate was largely predicated, that the proposal made by the union representatives on September 3d was rejected by Daniels on September 9th and that on the latter date Daniels proposed that all remaining employees not including those it proposed to put on a three-month suspension, return to work upon the condition that the status of discharged employees was final. As we read the evidence it clearly establishes that the meeting which was held on September 3d in the courtroom of District Judge Lambros in Cleveland was attended by the parties to the suit then pending before him in which an injunction was being sought,[9] their attorneys and other interested persons. The representatives of the unions who were present offered to secure the return of the striking employees if Daniels would reemploy all of them, the ultimate status of Roper and Eckley, who started the strike, to be submitted to the grievance procedure. Prior to this time Daniels had discharged four stewards and committeemen who were considered to be strike leaders and 26 other employees at Warren, all member of Local 377. Daniels refused the offer at the same meeting, however, not on September 9th as the district court found, insisting that all remaining employees must return to work before it would negotiate the status of those who had been discharged. Moreover, there was no evidence that this proposal by the union officers had been submitted to or would have been approved by the body of Local 377 members employed by Daniels.
 
 
 65
 Shortly thereafter Daniels made a counterproposal which was presented to the striking Local 377 Daniels employees at a meeting attended by most of them in the union hall in Youngstown on September 9th. It appears that this proposal was that all of the strikers would be returned to work without penalty except for the stewards and committeemen, whose discharges would stand, and five or six others who were to have to take a suspension. The grievances of Roper and Eckley were to be processed through the grievance procedure. This proposal, which appears to be a reasonable compromise between the unions' position indicated by its September 3d offer and Daniels' own position on September 3d, was presented to the striking employees at the meeting by O'Neill and the attorney for the striking Local 377 members both of whom recommended that it be accepted but the strikers voted unanimously to refuse it.
 
 
 66
 Up to September 9th none of the striking members of Local 249 at Pittsburgh had been discharged. However, on that day Eazor discharged the road steward, the road committeeman and another member of Local 249 at Pittsburgh. Daniels and Eazor on the same day, as we have pointed out earlier in the opinion, sent letters to all striking Local 377 and 249 members, respectively, other than Roper, Eckley, the stewards and the committeemen, offering them the opportunity to return to work without penalty if they returned on September 11th and with a penalty if they returned on the 16th. This offer, which we believe also was a reasonable effort on the plaintiffs' part to end the strike, was rejected, however, and on September 17th Daniels sent letters of discharge to the remaining 157 striking employees at Warren, and closed that terminal permanently, thus ending the strike there. The strike continued at Pittsburgh, however, until following an affirmative vote by secret ballot on September 24th the striking members of Local 249 voted to return to work the next day and ended the strike there. By the counterproposal submitted by Daniels to the members of Local 377 on September 9th and the letter which Eazor sent to the members of both locals on the same day Daniels and Eazor offered to take back all their striking employees, including the 26 who had been previously discharged at Warren, except the stewards and committeemen, who had led the strikes. These strike leaders Daniels and Eazor had, as we have seen, a clear legal and contractual right to discharge without recourse to grievance procedure. As we have indicated the duty to mitigate damages did not require them to give up this basic right. To hold otherwise would divest the right of any meaning. We conclude that by the counterproposal of September 9th and the offer contained in the letter of the same date, both of which the strikers rejected, Daniels and Eazor satisfied any obligation which rested on them to take action to mitigate their damages. The determination of the district court that they failed in their duty to mitigate their damages accordingly cannot be sustained. It was, accordingly, error for the court to reduce on this account the damages awarded to them.
 
 
 67
 Included in the figure of $1,079,332.00 representing the plaintiffs' loss was an item of $52,108.00 expended for fees and expenses of counsel which the district court disallowed and deducted from the loss allowed. The plaintiffs urge that this was error, asserting that these fees and expenses were incurred in connection with the work stoppage and were, therefore properly allowable as an element of their loss. Conceding that legal expenses of that nature would be properly allowable, Sheet Metal Workers Local 223 v. Atlas Sheet Metal Co., 5 Cir. 1967, 384 F.2d 101, 110, the district court nonetheless held that the plaintiffs had failed to sustain their burden of proving what portion, if any, of these legal expenses were directly related to ending the strikes. In so holding we are convinced that the court erred. On the contrary, our examination of the uncontradicted evidence satisfies us that the plaintiffs did establish that all of this amount but a very small portion, so small in fact as to be fairly treated as de minimus, was incurred in connection with the work stoppage. This item must, accordingly, be allowed.
 
 
 68
 The district court having determined that the aggregate loss proved to have been suffered by the plaintiffs as the result of the strike was $1,079,332.00, a determination which we have accepted, it remains to assign to each of the two actions here consolidated the share properly applicable to it and to determine the portion of that figure attributable to the period for which the defendant unions were responsible.[10]
 
 
 69
 To apportion the loss between Daniels and Eazor the district court determined that 36.5% of the loss was incurred by Daniels as the result of the strike by Local 377 members and 63.5% by Eazor as the result of the strike by Local 249 members. This apportionment is not seriously challenged on these appeals and we accept it. Applying it to the figure of $1,079,332.00, the aggregate loss of both plaintiffs resulting from the strikes, the loss sustained by Daniels amounted to $393,956.18 and that sustained by Eazor amounted to $685,375.82.
 
 
 70
 To take into account the fact that the liability of Local 377 and the Teamsters International Union for the loss sustained by Daniels from the strike at Warren did not arise until the third day of that strike, which lasted 29 days in all, we must subtract 2/29 of the Daniels loss from its total loss. Two twenty-ninths of $393,956.18 is $27,169.39. Subtracting this figure from Daniels' total loss of $393,956.18 leaves a figure of $366,786.79 representing the portion of the loss sustained by Daniels for which Local 377 and the Teamsters International Union are responsible. Taking into account the fact that the liability of Local 249 and the Teamsters International Union for the loss sustained by Eazor from the strike at Pittsburgh did not arise until August 22nd, the third day of the strike at Warren, which was the second day of the strike at Pittsburgh, and that the Pittsburgh strike lasted 35 days in all, we must subtract 1/35 of Eazor's loss from its total loss. One thirty-fifth of $685,375.82 is $19,582.17. Subtracting this figure from Eazor's total loss of $685,375.82 leaves a figure of $665,793.65 representing the portion of the loss sustained by Eazor from the strike for which Local 249 and the Teamsters International Union are responsible.
 
 
 71
 The district court in entering its judgment awarded prejudgment interest from September 25, 1968, the date on which the work stoppage ended. The defendants strongly object to this award urging that it was improper to allow such interest in a suit for unliquidated damages. The general rule is that when the damages resulting from a breach of contract are ascertainable with mathematical precision prejudgment interest is awardable as of right. If, however, the claim is not for a liquidated sum but is nonetheless pecuniary rather than personal in its nature many courts will add prejudgment interest to the amount which they find would have been just compensation at the time of the breach, when in the exercise of their discretion it appears necessary to do so in order to arrive at fair compensation at the time of judgment. Miller v. Robertson, 1924, 266 U.S. 243, 258, 45 S.Ct. 73, 69 L.Ed. 265; United States v. Bethlehem Steel Corp., 3 Cir. 1940, 113 F.2d 301, 308, aff'd, 1942,315 U.S. 289, 62 S.Ct. 581, 86 L.Ed. 855; Cold Metal Process Co. v. United Engineering & Foundry Co., 3 Cir. 1956, 235 F.2d 224, 231; Marrazzo v. Scranton Nehi Bottling Co., 1970, 438 Pa. 72, 263 A.2d 336; Restatement of Contracts § 337; McCormick on Damages, 1935, 356. We think that this is an appropriate rule for discretionary application as a matter of federal law in actions brought under section 301 of the Labor Management Relations Act for breaches of labor agreements and that the district court did not err in its discretionary application of the rule in this case.
 
 
 72
 The judgment entered by the district court in these consolidated cases will be modified by awarding to the plaintiff Daniels against the defendants Teamsters International Union and its Local 377 damages in the sum of $366,786.79 plus interest thereon at the rate of 6% per annum from September 25, 1968 to June 10, 1974, the date of judgment, and to the plaintiff Eazor against the defendants Teamsters International Union and its Local 249 damages in the sum of $665,793.65 plus interest thereon at the rate of 6% per annum from September 25, 1968 to June 10, 1974, the date of judgment, in each case with costs. As so modified the judgment will be affirmed. Each appellant shall bear its own costs on appeal.
 
 
 
 [1]
 In the Central States Area Over-the-Road Motor Freight Supplement the word "Unions" at this point appears as "Union", apparently as the result of a typographical error
 
 
 [2]
 The bracketed clause appears only in the two supplemental agreements to which Local 377 was a party
 
 
 [3]
 The injunction was issued by the state court on a complaint filed by Eazor in that court
 
 
 [4]
 The injunction was issued in that one of these consolidated suits which was originally brought in the Court of Common Pleas of Trumbull County, Ohio and removed to the United States District Court at Cleveland. As we have stated, that suit then sought injunctive relief as well as the damages which are the subject of the judgment here appealed from
 
 
 [5]
 Although such an agreement is binding on the individual union members, the employer has no action for damages against them individually for their breach of the agreement where the union has been adjudged liable for the damages from the breach. Atkinson v. Sinclair Refining Co., 1962, 370 U.S. 238, 249, 82 S.Ct. 1318, 8 L.Ed.2d 462. Further, it has been held that the employer is in any event without a remedy for damages for breach of contract against individual union members who have engaged in a wildcat strike. Sinclair Oil Corp. v. Oil, Chemical and Atomic Workers International Union, 7 Cir. 1971, 452 F.2d 49
 
 
 [6]
 That such discipline has been successfully used by a Teamsters local and that its use might well have been successful here is indicated by the case of an unauthorized strike by members of Local 241 of the Teamsters International Union against Eazor at Sharon, Pennsylvania in April 1968 where the strike was ended when a steward who refused to cross the illegal picket line was removed by the officers of the local union and another put in his place who led most of the strikers back to work across the picket line
 
 
 [7]
 While the ordinary rules of contract law apply to collective bargaining agreements, their application is necessarily limited in some respects. NLRB v. C & C Plywood Corp., 1967, 385 U.S. 421, 430, 87 S.Ct. 559, 17 L.Ed.2d 486; Transportation-Communication Employees Union v. Union Pacific R. R., 1966, 385 U.S. 157, 160-161, 87 S.Ct. 369, 17 L.Ed.2d 264
 
 
 [8]
 The court in this finding used the name "Eazor" in referring to the Daniels operation since Eazor was then operating Daniels. We use the name "Daniels" when referring to the Daniels operation by Eazor
 
 
 [9]
 This was the suit begun in the Court of Common Pleas of Trumbull County, Ohio which is one of the two suits now before us on these appeals
 
 
 [10]
 The district court computed the portion of the aggregate loss suffered by the two plaintiffs which was allocable to the first two days of the strike and subtracted that amount from the aggregate loss before determining the portion of that loss which was sustained by each plaintiff. We have reversed this process in order to arrive at an apportionment of the damages which we believe will be more equitable in view of our denial of the defendants' claim for mitigation of the damages