**COOK INDUSTRIES, INC., d/b/a River-side Industries, and City of Marks, Plaintiffs,**

**v.**

**Mrs. Beverly M. CARLSON et al., Defendants.**

**No. DC 701–K.**

United States District Court,
N. D. Mississippi,
Delta Division.

Dec. 3, 1971.

Pat D. Holcomb, Clarksdale, Miss., for Cook Industries, Inc.

Ben M. Caldwell, Marks, Miss., for City of Marks.

Ted Lucas Smith, Batesville, Miss., James F. Schaeffer, Memphis, Tenn., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In this diversity action, the plaintiffs are Cook Industries, Inc., suing on behalf of its corporate subsidiary, Riverside Industries (Riverside), a business entity engaged in processing cotton and bean seed, refining vegetable oil, and manufacturing agricultural chemicals, and the City of Marks, Mississippi (Marks), and the defendants are two sisters, Beverly M. Carlson and Ellen M. Berlin, who are Tennessee citizens owning certain farmlands and subdivision property in and near Marks, Mississippi.[1] The suit was originally brought on December 16, 1969, in the Chancery Court of Quitman County, Mississippi, in which plaintiffs averred that Riverside as lessee-operator of the industrial property and Marks as its lessor-owner held an easement for water drainage across the adjoining property of defendants and sought an injunction to require the opening of a drainage ditch on the Carlson property as well as damages for defendants' closing the ditch on the previous day. The Chancellor immediately and without notice issued the temporary injunction requested.

On January 14, 1970, defendants removed the case to federal court, asserting in their removal petition that their farm tenant, E. T. Kelsay, Jr., a Mississippi citizen, was fraudulently joined as a defendant for the sole purpose of defeating federal diversity jurisdiction. Plaintiffs did not seek any relief against Kelsay, nor did they file a motion to remand or otherwise question removability. Kelsay has made no appearance in the cause. Thus the court disregards his joinder as a party defendant in accepting jurisdiction.

Plaintiffs charge in their complaint that for 25 years Marks has continuously used and maintained an easement across defendants' lands for the drainage of storm and surface waters from a large portion of the city's area and that Riverside for more than 10 years had used the same drainage ditches for draining water used in its manufacturing operations; and that the closing by defendants of a portion of the drainage ditch at a point near Riverside's property line, if allowed to remain, would cause the water to back up and flood Riverside's plant, thereby causing it great property damage and the discontinuance of its business operations, and such condition also threatened with flooding the businesses, homes and other property of the citizens of Marks. By their answer, defendants denied that plaintiffs had an easement for drainage across their property either by prescription or otherwise, and asserted that Riverside had substantially changed and increased the natural flow of water by its constant pumping of huge quantities of polluted, odorous and unsightly fluids onto their property. Admitting that they closed the drainage ditch as charged, the defendants nevertheless asserted a legal right to abate the condition as a private nuisance. Defendants counterclaimed for injunctive relief against continued maintenance of a nuisance and also substantial damages for injury to their lands resulting from the joint acts of Riverside and Marks.

By an amended complaint, plaintiffs pled that Marks held an easement grant which defendants executed on May 31, 1961, for a right-of-way through and across an area later known as Morgan Manor Subdivision to construct a drainage ditch and to enlarge and clean out drainage ditches on the described property. Defendants counter that the instrument was executed as the result of misrepresentation or mistake, but if valid the grant was intended only as a general drainage easement covering only a small portion of the ditch involved in the controversy, and the excessive and

---

1. Cook Industries, Inc., is a Delaware corporation having its principal place of business at Memphis, Tennessee, and since 1969 has been the sole stockholder of Riverside Industries, a Mississippi corporation, with its principal place of business in Quitman County, Mississippi.

altered use by plaintiffs nevertheless violated the terms of the easement.

The court conducted an extensive evidentiary hearing, following which the parties submitted legal briefs. The case is now ripe for decision and this Memorandum Opinion will suffice for findings of fact and conclusions of law required by Rule 52, F.R.Civ.P.

## I.

Many basic facts are undisputed. On December 15, 1969, the defendants together with their husbands hired a bulldozer and operator and directed the building of a small dam in an open ditch which drained industrial water from Riverside's plant through defendants' lands. This dam was built on subdivision lots owned by Mrs. Carlson southeast of Riverside's fenceline. This abrupt halt to the flow of water soon caused a backup on Riverside's property. Because Riverside's operations required a place to discharge liquid waste and used water, the plant was forced to shut down nine hours until the backwater subsided and an emergency means of drainage was obtained by digging a ditch southerly on Riverside property to an established east-west drain along Roger Road, the water then going east to a point at which the flow reentered the ditch in controversy on other property of Mrs. Berlin.

The general course of the disputed ditch extended southeasterly across subdivision lots for approximately 1000 feet, or to Roger Road, from which the drainage continued in an open ditch in the same direction for another 1200 feet to Tom Hill Bayou. Tom Hill Bayou flows on a northerly course and empties into Coldwater River. This entire length of ditch runs through property which defendants jointly inherited from their grandfather and came into possession of upon the death of their father in 1951. The property is partly inside and partly outside the southern corporate limits of Marks. The lands have since been partited between defendants, but most of the property is still farm land consisting of 142 acres lying south of Roger Road, of which Mrs. Berlin owns 66 acres and Mrs. Carlson owns 76 acres. The balance of the subject property, owned by Mrs. Carlson, lies north of Roger Road, and presently consists of 19 lots in Morgan Manor Subdivision. Established in 1961, this subdivision has four dedicated streets which run north and south. Three streets have been paved, and residences have been built upon certain lots previously sold by Mrs. Carlson. The fourth street, Poplar, is one block long and has not been laid out or improved. Poplar Street is bisected by the first segment of the disputed ditch about 300 feet southeast of the east boundary of Riverside property. The lots owned by Mrs. Carlson which abut the east and west sides of Poplar Street are low and vacant ground.

In the mid-1960s Marks, in accordance with city-developed plans, was permitted to come upon the subdivision area to cover old ditches, put in underground sewer pipes, adjust remaining ditches, and pave certain streets. The elimination of unnecessary ditches, without doubt, made the territory more suitable for subdivision development. As a part of this program Marks secured from defendants an easement grant which confirmed the historical natural drainage through the open ditch to Roger Road and also granted the city a right to expand its underground storm sewer system southwardly under and along Poplar Street and thus connect with the open ditch leading to Tom Hill Bayou. Pursuant to this grant, Marks extended the storm sewer which is actively used by the city. After this litigation began, Riverside rerouted its effluent through this underground pipe, thus avoiding contact with Mrs. Carlson's lots lying west of Poplar Street.

Years before, in 1937—with the consent of defendants' father—Marks had deepened and enlarged a ditch forming the west fork of Tom Hill Bayou to improve the surface drainage into Coldwater River. The city, however, never used the ditch as a sanitary sewer or

for any purpose other than to remove uncontaminated water.

In 1956 Riverside, or its predecessor in title, purchased from Mrs. Berlin part of the lands on which its plants are located and which had drained through the open ditch crossing the lots now known as Morgan Manor Subdivision and on into Tom Hill Bayou. Since 1940, Riverside and its predecessor operated both a cotton gin and oil mill on this original property, making use of defendants' drainage ditch for discharge of industrial water without objection until the present controversy arose.

In 1966 Marks acquired by purchase Riverside's entire industrial property and made extensive expansions of plant and equipment at a cost of $2,500,000, financed by industrial revenue bonds. These improvements included the installation of a new system of seed crushing and oil refining, which called for the use of a much greater amount of water. Riverside then became the operator of the expanded property, under a long-term lease executed with the City, in accordance with Mississippi's BAWI program.[2] The new system was installed by Riverside's operating personnel, after ascertaining the operating experience of similar plants and seeking consultants' advice regarding the treatment of waste.

The new oil refinery process entailed the commingling of raw materials and chemical substances with large volumes of water supplied by three wells having a total output of 3200 to 3400 gallons per minute.[3] Riverside operated its plant uninterruptedly 24 hours each day, with downtime of not more than 30 days annually. While Riverside's chemical plant discharged its waste into a separate underground system, the oil refinery discharged effluent directly into the open ditch at the rate of approximately 3200 gallons of used water per minute. This volume of discharge never exceeded the ditch banks or overflowed on adjoining property. The effluent, however, contained quantities of oily substances and waste materials mixed with water, which produces an unpleasant odor varying in intensity with weather and operational conditions, and presents an unsightly appearance in pools of discolored water and greasy film alongside ditch banks. Riverside's effluent was the only industrial waste entering the ditch system and, without doubt, caused the stated specific conditions which had not previously existed.

In September 1969, defendants began objecting to Riverside and Marks that the effluent, because of its odor and appearance, was hampering the development of their land for residential purposes. They threatened litigation to abate the offensive condition. A series of letters passed, and certain meetings took place, among the parties. Riverside advised defendants that it was planning to install a 20,000 gallon digester tank to reduce the amount of oil content in the effluent, which new filtering process would be in operation by December 19, 1969. Marks had under active consideration the rerouting of the open ditch to avoid crossing the lots in Morgan Manor Subdivision. Defendants found these proposals unacceptable and, after arranging for newspaper publicity, caused the ditch to be dammed up, as heretofore stated, to get the better attention of Riverside and Marks and force them to take more effective measures.

The evidence indicated that Riverside, in constructing the oil refinery, had installed a filtering system of traps to

2. The State's policy for balancing agriculture with industry by encouraging the development of business enterprises by its political subdivisions is set forth in Chap. 147, Laws of 1960, Miss.Code Ann. § 8936-51 et seq.

3. Prior to this time Riverside had installed in 1951 a 400 gallon capacity well; in 1960, it added an 800 gallon capacity well. These wells, which operated alternately, discharged clear water when used with the plant's oil extractor. A 2000 gallon capacity well was installed in 1968, as part of the new refinery plant which is designed for the simultaneous, constant use of the three wells.

separate the vegetable oil substances from water, which system was supplemented by the additional digester tank which was placed in operation as scheduled. Although Riverside has had the effluent periodically checked for impurities and asserts that the discharge meets known standards of water quality, the evidence preponderates in favor of our finding that the discharge has a significant amount of floating and suspended solids and oils, producing sludge deposit, water discoloration and a distinct odor. The drainage ditch, last cleaned out by Marks in 1967, has an unsightly appearance which would be improved by the removal of weeds and brush. The condition, insofar as appearance is concerned, has been aggravated by defendants' instructions to their farm tenant to deny Marks access to clean out the ditch south of Roger Road and thus improve the water flow. North of Roger Road the open drainage ditch is from 4 to 6 feet wide, while south of Roger Road the ditch widens to an average of 15 feet.

In 1968 and 1969 defendants' lands south of Roger Road was under a farm lease for an annual rent of $4,350. Kelsay had an option to renew for 1970 but allowed his lease to expire on December 31, 1969. Defendants then leased the same lands as a farm for 1970 to another tenant and at an increased rental of $5,000. This tenant, Clifton Jones, was still in possession at time of trial. Mrs. Carlson's lots north of Roger Road were for sale and never rented to anyone. She sold similar lots prior to 1968 for as much as $1,500 per lot, but made no subsequent sales nor actively sought buyers. Both Mrs. Berlin and Mrs. Carlson reside with their respective families in Memphis, and have not lived on the subject property for many years; their only contact with it was limited to occasional inspection visits.

The expert testimony of defendants' engineers was to the effect that the polluted condition of the ditch was abatable by the installation at Riverside's plant of secondary waste treatment methods which would effectively remove practically all oil content from the water, and also that systems could be devised to reuse the water, although this would entail substantial cost. These experts viewed Riverside's present filtering methods as no more than an inadequate primary system which was only 50% effective, in contrast with secondary waste treatment systems available on the market that are 90% effective in pollution control. Defendants also introduced evidence of damage to the market value of their property upon the assumption that the ditch cannot be returned to drainage of only rain water and the present conditions are not abated, thus producing permanent injury to their land.

## II.

### (a) SUMMARY ABATEMENT OF NUISANCE

The first issue for decision is whether the defendants had the right to resort to self-help by damming the ditch, assuming that the effluent was a private nuisance under the circumstances disclosed by the evidence. Mississippi recognizes the common-law right of an owner of property to abate a nuisance without resort to legal proceedings, provided he is able to do so without provoking a breach of the peace. Lindsey v. Shaw, 210 Miss. 333, 49 So.2d 580 (1950); 58 Am.Jur.2d, Nuisances, § 209, p. 810. There are, however, well known limitations upon the exercise of this right of summary abatement, and one who summarily abates a nuisance acts at his own peril and assumes all liability for exceeding the right. Am.Jur.2d, ibid, § 209; 66 C.J.S. Nuisances § 107, p. 857. The authorities generally affirm that summary abatement may be resorted to only in cases of urgent or extreme necessity, with the remedy confined to doing that which is necessary to abate the nuisance and in a manner avoiding unnecessary damage to the property causing the nuisance. It is also a settled principle that a greater degree of care is required for summarily abating a nuisance in the absence of an emergency

**816**

or imminent peril to the abater or his property. Am.Jur.2d, ibid, § 211; C.J.S. ibid, § 107.

■ Under the foregoing principles, the defendants have surely exceeded the right of summary abatement, for there was neither a necessity for blocking the flow of drainage from Riverside's plant nor was the nuisance abated by their act of damming the ditch. Having inaugurated discussions with Riverside and Marks regarding corrective measures, defendants, if dissatisfied with the progress of those negotiations, had every opportunity to institute legal proceedings, as indeed they more than once threatened. There was no urgency in their situation, nor were they confronted with immediate peril. Most of their property was farm acreage under an unexpired lease to a tenant holding an option for another year. As for Mrs. Carlson's subdivision, there was no proof that any pending sale was in jeopardy or that she was suffering immediate loss, necessitating summary abatement. The objectionable conditions of the effluent, with which defendants had merely occasional contact, had existed for more than a year. Moreover, the damming of the ditch did not abate the nuisance complained of, nor was it at all intended to relieve the problem. When they built the dam, defendants well knew that either Riverside would shut down the oil refinery or the effluent would find another route over their lands to flow into the main ditch leading to Tom Hill Bayou. Indeed, defendants admit that blocking the ditch was not to remove an offensive condition but a maneuver to gain publicity and community support for their position and force Riverside and Marks to take more effective action. The law does not countenance this sort of self-help.

■ We, therefore, hold that the defendants exceeded any right of summary abatement of conditions which they deemed to be a nuisance, and their unlawful act in blocking the drainage ditch renders them liable for the invasion of Riverside's right to the enjoyment of its property. Although blocking the ditch directly affected only Riverside's operation and not Marks generally, defendants' acts and threats to block drainage across their property, prior to a legal determination of the controversy, justified both plaintiffs in seeking equitable relief against defendants, and the temporary injunction granted by the Chancellor was rightly issued.

■ There remains Riverside's claim for damages of $10,625.98 which it seeks to recover as gross income lost while the refinery was shut down because of flood threat. Certainly, Riverside's shutting down the plant was a reasonable business decision, and its business interruption was held to minimum time because of the efficient way in which Riverside supervised its operation and diverted the discharge elsewhere. Riverside has not sought to establish what were the actual outlays or costs incident to the shutdown or recover incurred expenses attributable to defendants' act, but demands recovery of the gross operating income that the refinery would have earned during the 9-hour period but for the shutdown. An elemental but cardinal rule in allowing damages is that the injured person shall be made whole and receive full compensation for the injury but that he not derive profit from the amount awarded. Mississippi Power Co. v. Harrison, 247 Miss. 400, 152 So.2d 892 (1963). There is no evidence that Riverside's oil refinery had a history of profitable operation. But even if the court assumes that it is reasonably certain that Riverside, as an established business, does conduct a profitable operation and would, therefore, be entitled to recover loss of profits for business interruption, Riverside has nevertheless ignored certain principles applicable generally where lost profits are claimed as damages. All expenses saved because of a defendant's wrongful act must be subtracted from the recovery; hence, a plaintiff is entitled to recover his *net* profits, and not expected gross profits or gross income. 22 Am. Jur.2d, Damages, § 178, pp. 253–254. Net

profit, in this context, is defined as the gross amount that would have been received pursuant to the business or investment that was interrupted by a defendant's wrongful act, less the cost of running the business or attempting the investment. Ibid § 178, p. 254. Claims for loss of profits arise more often in breach of contract cases than in tort situations, but the method of computing damages is the same. The Supreme Court of Mississippi applied the rule in McDaniel Bros. Construction Co. v. Jordy, 195 So.2d 922 (Miss.1967), involving breach of contract. It was held that the plaintiff could recover the profits he would have made if permitted to complete the contract, but not what it would have cost him to do the job. To the same effect are Bluethenthal Co. v. McDougal, 163 Miss. 406, 141 So. 291 (1932), and Jones v. Griffin, 157 Miss. 256, 126 So. 35 (1930).

 Riverside has computed "gross income loss" based upon the monetary value of 9 hours' production of crude oil, protein meal and refined oil, less the cost of soybeans and freight-in. No deduction has been made for other expenses saved, such as fuel, chemicals and other materials used in the manufacturing process, or of unneeded labor during the shutdown. The record is silent on such matters. Thus, an award to Riverside based on gross income, or gross profits, would be more than the actual loss sustained, and the court must reject the claim accordingly. Nor does the court have any data or information from which it may determine the necessary deductions, and thus ascertain the net loss with reasonable certainty and not upon conjecture. Unquestionably Riverside had records which would throw light upon this inquiry but they were not disclosed to the court, although under the Missisippi rule the "most accurate and reliable evidence available [is] required to prove anticipated profits." Harrison v. Prather, 435 F.2d 1168 (5 Cir. 1970). Riverside has thus failed to carry its burden of proving lost profits in accordance with legal require-ments even though some loss was likely sustained. Riverside is entitled to recover nominal damages only, which are hereby assessed at $500, because of defendants' invasion of Riverside's rights. Nominal damages are not actual or compensatory damages, Southland Co. v. Aaron, 224 Miss. 780, 80 So.2d 823 (1955), and the court may not consider an award of punitive damages, even if defendants' act be regarded as deliberate and reckless, inasmuch as punitive damages are not recoverable in the absence of allowable actual damages. Allen v. Ritter, 235 So.2d 253 (Miss.1970); McCain v. Cochran, 153 Miss. 237, 120 So. 823 (1929); 25 C.J.S. Damages § 118, p. 1121.

### (b) DRAINAGE EASEMENT VERSUS PRIVATE NUISANCE.

 The next issue is whether the plaintiffs exceeded their right to drain water through defendants' ditch by main-taining a private nuisance. Plaintiffs unquestionably held drainage easements, collectively acquired, by prescription, express grant and implied grant. Marks had prescriptive right from more than ten years' use of the ditch, and this was supplemented by express grant across the lots north of Roger Road. These dual rights afforded necessary drainage for a watershed of 92 acres presently forming the southeast quadrant of the city including Riverside's plant. The public drainage encompassed not merely rain and surface water but also waters entering the storm sewers from the town's businesses and other users. The 20-foot wide easement which defendants granted to Marks was not limited to storm water but extended to all water that the ditch, as it then existed, could accommodate reasonably and without overflowing. This was understood by defendants when they executed the document in return for municipal improvements. It is equally clear that Riverside and its predecessors owned an easement for private drainage by defendants' ditch both by prescriptive right and use for more than ten years and by implied grant of defendants upon

their sale to them of parcels of land which drained into the ditch. And we agree that plaintiffs would not have exceeded their right by merely increasing the amount of clear water discharged, where the ditch, as here, remained approximately the same size, without change in dimensions, and capable of handling the increased flow. Moreover, the easements held by plaintiffs gave them the right, at their expense, to clean out the ditch and maintain it as a usable drain outlet. Cf. Quin v. Sabine, 183 Miss. 375, 183 So. 701 (1938).

These easements, however, did not confer a right for either plaintiff to discharge polluted and contaminated water which began in 1968 when new manufacturing processes were installed in the oil refinery and caused damage to defendants' property. The offensive odors and appearance thereby produced amount to a private nuisance and are a condition neither authorized by defendants' grant nor justified by a ten-year prescriptive period. Mississippi Mills Co. v. Smith, 69 Miss. 299, 11 So. 26 (1892); City of West Point v. Womack, 178 Miss. 808, 174 So. 241 (1937). To acquire the right to maintain a private nuisance by prescription, the nuisance must have been maintained in substantially the same manner and with equally injurious results throughout the entire prescriptive period; if the nuisance is of progressive character, there can be no acquisition of prescriptive right. This principle was applied in an analogous case, Mississippi Mills Co., supra, where the plaintiff was allowed to recover damages for the pollution of a stream upon evidence that the defendant factory, within less than five years before the action was brought, had changed the bed of the stream, increased the flow of water and caused the deposit of a much greater amount of damaging impurities on plaintiff's land. The Court held that, although the defendant had enjoyed an uninterrupted use of the stream for 20 years, its easement did not extend to its enlarged and changed use of the stream which injured plaintiff's land. The Womack case applied the same rule against a municipality where, after 15 years of using a sewer outlet without damage, West Point then attempted to make a different use of the drain which caused an injury to plaintiff's property. The Court found that the city had no prescriptive right to do so.

The undisputed evidence shows that the industrial plant causing the private nuisance was constructed and placed into operation through the joint and cooperative efforts of Marks as plant owner and Riverside as operator. As participants in the venture, they are jointly and severally liable for the wrong and injury done. 58 Am.Jur.2d, Nuisances, § 56, p. 623. They are joint tort feasors in the creation and maintenance of the nuisance. The court rejects Riverside's argument that it should escape responsibility because Marks is under a contractual duty to provide it with effluent drainage and thus the municipality is alone responsible. Equally untenable is Marks' contention that it should not be liable because it has no control over the operation of the refinery, as well as the meritless plea of governmental immunity in the exercise of corporate functions. It is sufficient to note that in this action neither Riverside nor Marks has sought indemnity or other relief against the other, and the obligations as between the plaintiffs are not a matter for present determination.

### (c) SCOPE OF RELIEF AGAINST MAINTENANCE OF PRIVATE NUISANCE

The final issue concerns what is the appropriate relief in view of the determination that plaintiffs are maintaining a private nuisance on defendants' property. The court must consider the propriety of legal damages, equitable relief, or both remedies.

Ordinarily, the measure of damages recoverable at law is wholly determined by the type of nuisance involved, that is, whether the injury it produces is temporary and abatable or permanent and irremediable. The rule is established in Mississippi and by the auth-

orities generally, that where a party is liable for maintaining a nuisance by polluting a stream and another's land is thereby damaged, the measure of allowable damages is the diminution of the market value of the property if the injury is of a permanent nature, or the diminution in the rental or usable value if the injury is of a temporary nature. In addition, the landowner is entitled to recover special or incidental damages such as annoyance, discomfort, inconvenience, sickness, and possibly other elements. City of Oxford v. Spears, 228 Miss. 433, 87 So.2d 914 (1956); Southland Co. v. Aaron, 221 Miss. 59, 72 So.2d 161 (1954); 66 C.J.S. Nuisances § 175, p. 979. Where the nuisance is temporary and abatable, the state Supreme Court's teaching is:

> "The method of determining the damages due to the landowner because of the depreciation in rental value is an equitable method, because it is in fact a method to establish the amount due by the trespasser for the wrongful use of the adjoining land for his purpose. Moreover, it is not only a correct measure of damages, but experience has taught us that it is the best method of determining damages for temporary nuisance." Love Petroleum Co., Inc. v. Jones, 205 So.2d 274, 275 (Miss.1967).

In the case sub judice, it would appear under any view of the evidence that despite Riverside's unsuccessful efforts to date of trial to eliminate the impurities from its waste water, the polluted conditions are abatable. Indeed, all parties press upon the court the concept that the offensive quality of the effluent is subject to correction, although they strongly disagree as to the nature of the remedy. Defendants urge that only the installation of an effective secondary treatment system, necessitating an investment of about $250,000, will remove the oily, objectionable content from the water so as not to injure them. Plaintiffs assert that periodically cleaning out the open ditch would substantially reduce, if not eliminate, the damage. The

evidence suggests other possibilities, such as diverting the effluent, filling in ditches, additional ditch covering in critical areas, as methods of abating the nuisance. Still other alternatives for an effectual remedy may arise from standards fixed by state and federal regulatory authorities for the effluent to be discharged into Coldwater River. At this juncture, the court may not conclude that permanent injury has been committed and must base an award of damages upon the conclusion that the nuisance is abatable. The evidence affirmatively discloses that up to the time of trial no diminution had resulted in the rental value of defendants' farm acreage since the nuisance began. Defendants received greater rent in 1970 and 1971 than they did in 1968, and do not claim that the polluted ditch has adversely affected its fair rental value as farm land. Mrs. Carlson did not attempt to offer evidence that the rental or usable value of her remaining subdivision lots has been diminished since 1968. While the law allows special or incidental damages in a case of this kind, the defendants, who are nonresidents, were unable to present evidence of legally cognizable special damages. The court is again confronted with allowing only nominal damages, which are hereby assessed in favor of defendants against both plaintiffs in the amount of $350. These damages are computed at the rate of $100 per year from the commencement of the nuisance until date of trial.

There remains for consideration the matter of equitable relief for defendants since it is evident that the nuisance is of a continuing nature and is the result of repeated acts of trespass. Yazoo & M. V. RR Co. v. McConnell, 127 Miss. 581, 90 So. 321 (1922). It is equally apparent that the real injury to defendants cannot be made whole in successive actions at law for small damages, thus making for an inadequate legal remedy. Their real injury arises not so much from the fact that Mrs. Carlson is somewhat hampered in selling her remaining subdivision lots—which is true—but from

**820**

the interference to the proper development by both defendants of a significant portion of their lands south of Roger Road for residential purposes. Without doubt, this is the highest and best use of their property, and the north portion of this acreage, if not now, will soon be ready for subdivision development. The change from farm to residential use will, of course, greatly enhance values of the property. A continuation of a polluted ditch through that area will surely interfere with the efficient and orderly program of development. Such will cause the defendants to suffer irreparable injury, which cannot be redressed by legal damages recovered in future actions that are limited to losses in the rental value of their property in its present condition as farm acreage. These are substantial considerations which impel the court to grant equitable relief and not withhold it simply because defendants' conduct prior to suit may be unappealing. Furthermore, equity may adjust the situation to the need of the parties. To enjoin the operation of the plant until the nuisance is abated would be unduly harsh. Riverside and Marks cannot immediately abate the nuisance; they are entitled to have a reasonable time within which to effect a remedy by removing the effluent's offensive odors and unsightly appearance which are of damaging effect to defendants' property. As stated in Alfred Jacobshagen Co. v. Dockery, 243 Miss. 511, 139 So.2d 632 (1962): "Where it is possible that a defendant may be able to prevent further material damages to plaintiffs without ceasing operations, he will be given a reasonable time and opportunity to obviate the nuisance, and the issuance of an injunction may be delayed or its operation postponed or suspended for a reasonable time for that purpose.' " So the equities are here balanced by the court's holding that a private nuisance exists as the oil refinery is presently operated, but allowing Riverside and Marks reasonable time to correct the unlawful condition. Riverside and Marks are directed forthwith to make an adequate en-

gineering study and take all proper steps to abate the pollution as soon as practicable, but in no event later than January 1, 1973. The court will postpone until that date the issuance of a permanent injunction against the further maintenance of the private nuisance.

In order to avoid a multiplicity of suits, the court retains jurisdiction over the cause for the purpose of issuing further and supplemental orders in accordance with the views herein expressed. Should Riverside and Marks be unable, notwithstanding their good faith efforts, to abate the nuisance and remedy the damage to defendants' property by January 1, 1973, the court may, in its discretion, terminate injunctive relief and award the defendants substantial damages for the permanent injury to their property, based upon the evidence already submitted.

Let an order be entered accordingly.