**DELAWARE COCA–COLA BOTTLING COMPANY, INC., Plaintiff,**

v.

**GENERAL TEAMSTERS LOCAL UNION 326, Defendant.**

Civ. A. No. 77–303.

United States District Court, D. Delaware.

July 18, 1979.

---

Richard G. Elliott, Jr. of Richards, Layton & Finger, Wilmington, Del., and O. R. T. Bowden of Hamilton & Bowden, Jacksonville, Fla., for plaintiff.

Francis S. Babiarz and John E. Babiarz, Jr. of Biondi & Babiarz, Wilmington, Del., for defendant.

## OPINION

LATCHUM, Chief Judge.

Delaware Coca-Cola Bottling Company, Inc. ("Coca-Cola" or "the Company") instituted this action for an alleged breach of a collective bargaining agreement on August 5, 1977.[1] (Docket Item 1). The Amended Complaint seeks both compensatory and punitive damages from the General Teamsters Local Union 326[2] ("the Union") as the result of a strike that occurred at Coca-Cola's Wilmington bottling plant in the summer of 1977. (Docket Item 22). A two-day trial to the Court was held on January 29th and 30th and the case is now ready for final disposition.[3] This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52(a), F.R. Civ.P.

## I. BACKGROUND FACTS

Coca-Cola is a Delaware corporation which is wholly owned by Coca-Cola Bottling Company of Miami ("Miami Coke"). (Docket Item 5, ¶1; Transcript, p. 23).[4] The Company is engaged in the production, distribution and sale of Coca-Cola products. (Tr. 20, 25). It purchases soft drink ingredients under a franchise agreement with The Coca-Cola Company U.S.A. and then processes and bottles those ingredients for distribution and sale in Delaware, Maryland and Pennsylvania. (Tr. 20, 25). The processing and bottling operations are carried on at plants in Wilmington, Delaware and Salisbury, Maryland. (Tr. 20–21, 24). Two other plants are also maintained in Maryland for the purpose of distribution and sales. (Tr. 20).

1. Jurisdiction exists by virtue of Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. (Docket Item 50, ¶ II(a)).

2. The original complaint also named the Eastern Conference of Teamsters ("Eastern Conference") as a defendant. (Docket Item 1). After engaging in discovery, however, Coca-Cola moved to amend its complaint so as to assert its claims solely against the Union, and to dismiss its claims against the Eastern Conference with prejudice. (Docket Item 22). That motion was granted by the Court (Docket Item 23).

3. The parties have submitted post-trial briefs setting forth their respective positions. (Docket Items 57, 59, and 61).

4. Hereinafter references to the transcript will be noted as follows: ("Tr.—").

The Union is an organization which exists in part for the purpose of dealing with employers concerning wages, grievances, and conditions of employment. (Docket Item 22, ¶ 4; Docket Item 5, ¶ 4). In November, 1975, the Union was certified by the National Labor Relations Board ("the Board") as the collective bargaining representative of both the drivers, and the production and maintenance ("P & M") employees at Coca-Cola's Wilmington plant. (Tr. 4).

Following its certification, the Union and Coca-Cola held a series of bargaining sessions in an effort to develop a collective bargaining agreement. (Tr. 4). Eventually, they did reach an agreement ("contract") with regard to the P&M employees. (Tr. 5). That contract contained a broad "No-Strike" clause and two other separate clauses which set up a grievance and arbitration procedure. (Plaintiff's Exhibit 1, Articles 14, 15, and 16).[5] The effective dates of the agreement were June 1, 1976 to May 31, 1979.

The parties thereafter continued to negotiate for approximately a month with respect to the drivers at the Wilmington plant. Those negotiations were suspended after July 9, 1976 because Coca-Cola decided to engage Countrywide Personnel ("Countrywide") to supply it with drivers and it transferred all of its drivers to that company. (Tr. 5). The Union agreed with that arrangement and proceeded to negotiate a collective bargaining agreement with Countrywide. (Tr. 5, 78).

The parties operated in that fashion until March 22, 1977. (Tr. 6). At that point Coca-Cola terminated its relationship with Countrywide and the drivers reverted to their status as employees of Coca-Cola. (Tr. 6). On the following day Frank Sheeran, the President of the Union, ordered both the drivers and the P & M employees to strike. (Tr. 7, 9, 85). That strike lasted one day. (Tr. 9, 85).

Coca-Cola and the Union then held two negotiating sessions in an effort to reach an agreement with respect to the drivers. (Tr. 7, 85). At the second meeting on April 12, 1977, Mr. Sheeran threatened to call a strike if Coca-Cola did not agree to a separate contract for the drivers. (Tr. 11, 59, 86–87). Mr. Jones, the General Manager of the Wilmington plant, responded by telling Mr. Sheeran that the P & M workers would be breaching the P & M Contract if they went out on strike. (Tr. 11–12, 58, 86). Mr. Sheeran then replied that he didn't care; that the time to strike the Coca-Cola plant was in the summertime, and he wasn't going to wait until the issue was resolved. (Tr. 12, 59, 86–87). The parties thereafter broke off negotiations. (Tr. 12).

Approximately three months later the Union went out on strike. (Tr. 11, 59, 90, 107). The strike began on the morning of July 19, 1977 when the drivers set up a picket line in front of the plant. (Tr. 13, 59, 79). On the first morning all of the P & M employees reported outside of the plant but they did not cross the drivers' picket line. (Tr. 13, 111–112, 125, 127). The same scenario was repeated each morning thereafter through July 27, 1977. (Tr. 21, 66, 111–112, 130). On the afternoon of the 27th the Union ordered the P & M employees back to work and by the following day they had all returned for work at the plant. (Tr. 21, 32, 105–107). The drivers continued to picket at the Wilmington plant until approximately August 12, 1977. At that point they abandoned their strike and returned to work.[6] (Tr. 21, 92).

Coca-Cola contends that the nine-day work stoppage by the P & M employees was authorized by the Union; and it further contends that the work stoppage was a clear and intentional breach of the contract which can only be remedied by an award of both compensatory and punitive damages. (Docket Items 57 & 61). The Court now turns to consider the merits of those claims.

---

**5.** Hereinafter references to exhibits shall be noted as either "PX—" or "DX—".

**6.** Less than a month after the strike ended the drivers voted to decertify the Union as their bargaining representative. (Tr. 10, 91).

## II. UNION RESPONSIBILITY FOR THE STRIKE

■ Coca-Cola contends that the Union should be held responsible for the strike by the P & M employees even though the Union denies that it authorized that strike. (Docket Item 57, p. 10). That contention is based on the Third Circuit Court of Appeal's decision in *Eazor Express, Inc. v. International Brotherhood of Teamsters,* 520 F.2d 951 (C.A. 3, 1975).

In *Eazor* the Third Circuit held that a Union which does not authorize or call an illegal strike may nevertheless be held responsible for the strike if it fails to take all reasonable steps to end it. *Eazor, supra,* at 959. The Union contends that *Eazor* is inapplicable to this case. (Docket Item 59, pp. 12–13). For the reasons that follow, however, the Court concludes that it is unnecessary to decide whether the Union may be held responsible for the strike under the theory adopted in *Eazor.*

The entire discussion in *Eazor* was premised on the findings by the district court that the unions in that case had not authorized or called the strike. *Eazor, supra,* at 959. In the present case, on the other hand, the Court finds that the Union did authorize or call the strike. That finding is based on the following evidence.

There were approximately twenty-five P & M employees working at the Wilmington plant in the summer of 1977. (Tr. 29). On the first day of the strike all of those employees showed up at the plant, but none of them crossed the drivers' picket line. (Tr. 13, 111–12, 125, 127). Each morning thereafter for eight straight working days those same twenty-five people showed up at the plant and then left without crossing the picket line.[7] (Tr. 13, 111–12, 125, 127). On the 28th of July, however, after being told

to report to work by the Union, all twenty-five P & M employees crossed the picket line. (Tr. 21, 32, 105–107).

In addition to the above evidence of concerted action, there was direct testimony by the Union's own witnesses that the P & M employees were told by the Union's own officers that they should not cross the drivers' picket line. For example, Leon Robinson, a union member and a P & M employee at the time of the strike, testified that Joe Baray, the steward for the P & M employees, told him that P & M employees were supposed to honor the drivers' picket line. (Tr. 110, 112–13). Similarly, Donald Watson, another union member and P & M employee, testified that Mr. Baray told him to go to the plant each morning but to stay on the other side of the street and not get involved with the strike. (Tr. 129). The substance of those conversations was essentially confirmed by Mr. Baray, who testified that the steward for the drivers "advised him" that he should tell all of the P & M employees that they should come to the plant each morning but that they should not cross the picket line or get involved with the drivers' strike. (Tr. 120–21). Finally, there was evidence that on the first day of the strike Mr. Sheeran applied to the Eastern Conference for strike benefits for all of the P & M employees in addition to the drivers. (Tr. 97–99, PX–3). On the basis of all of the evidence the Court finds that the Union was directly responsible for the strike by the P & M employees.[8]

## III. THE BREACH OF CONTRACT CLAIM

■ The next question the Court must decide is whether the strike by the P & M employees was illegal. Under the National

---

7. The only exceptions to this pattern were two employees who worked one and two days respectively. (Tr. 30–31).

8. Mr. Sheeran did testify that he did not instruct the P & M employees to go on strike. (Tr. 79–80). After hearing Mr. Sheeran's testimony and observing his demeanor, the Court has concluded that his story is not credible. The Court simply does not believe that a presi-

dent of a union would call a strike by one group of employees at a plant and at the same time give no instructions to the other union employees at the same plant. (*See,* Tr. 79–80). Such a result seems especially unbelievable in this case in view of the fact that Mr. Sheeran admitted that he had told all of the employees to go on strike a few months earlier in connection with the same dispute. (Tr. 84–85).

Labor Relations Act ("Act") employees have the right to engage in sympathy strikes. 29 U.S.C. § 157; *Gary Hobart Water Corp. v. NLRB*, 511 F.2d 284, 287 (C.A. 7), *cert. denied*, 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252 (1975); *Kellogg Company v. NLRB*, 457 F.2d 519, 522 (C.A. 6), *cert. denied*, 409 U.S. 850, 93 S.Ct. 58, 34 L.Ed.2d 92 (1972). That right, however, may be bargained away by the employees' union in the course of negotiating a collective bargaining agreement. *NLRB v. Allis-Chalmers Manufacturing Co.*, 388 U.S. 175, 180, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967); *Labor Board v. Rockaway News Co.*, 345 U.S. 71, 80, 73 S.Ct. 519, 97 L.Ed. 832 (1953).

■ In the present case the Union signed a collective bargaining agreement which contained a clause ("No-Strike clause") providing that:

> [T]he Union will not cause nor will any member of the bargaining unit take part in any strike, sit-down, stay-in, slow down in any operation of the Company or any curtailment of work or restriction of service or interference with the operation of the Company or any picketing or patrolling during the term of this agreement.

(PX 1, Article 16). The legality of the P & M employees' strike thus depends on whether the above No-Strike clause barred sympathy actions in support of an economic strike. *United States Steel Corp. v. United Mine Workers*, 548 F.2d 67, 72 (C.A. 3, 1976), *cert. denied*, 431 U.S. 968, 97 S.Ct. 2926, 53 L.Ed.2d 1063 (1977). That question, in turn, ultimately depends on the intent of the contracting parties. *Gateway Coal Co. v. United Mine Workers of America*, 414 U.S. 368, 382, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974). The Court,[9] therefore, must now decide whether Coca-Cola and the Union intended to bar economic sympathy strikes when they included the No-Strike clause in their contract. In order to make that decision the Court must look at the following three factors:

(a) the language of the contract as a whole;

(b) the state of the law at the time the contract was executed; and

(c) any collateral evidence of the parties' intent.

*Mastro Plastics Corp. v. Labor Board*, 350 U.S. 270, 279, 76 S.Ct. 349, 100 L.Ed. 309 (1956); *Rockaway News, supra*, 345 U.S. at 79–80, 73 S.Ct. 519.

■ The language of the contract as a whole suggests that the No-Strike clause was intended to have the widest possible application. The clause itself affirmatively provides that the Union will not engage in "any strike, sit-down, stay-in, slow down" etc. Thus it is framed in the broadest possible terms. In addition, the clause does not contain any limitations or exceptions, and it is not directly tied to the grievance and arbitration provisions or any other clause in the contract. Finally, the contract does not contain a picket line clause or place any other restriction on the No-Strike clause. The broad language of the contract thus suggests that economic sympathy strikes were to be barred by the No-Strike clause.

The state of the law at the time the contract was made also creates an inference that the parties intended to bar economic sympathy strikes when they entered into this contract. The contract was executed on June 1, 1976. (PX 1, p. 1). At that time every court that had considered a broad, independent clause like the one in this case had concluded that it barred sympathy actions in support of an economic strike. *Rockaway News, supra*, at 79, 73 S.Ct. 519; *United Steelworkers of America v. CCI Corp.*, 395 F.2d 529, 532–33 (C.A. 10, 1968), *cert. denied*, 393 U.S. 1019, 89 S.Ct. 627, 21 L.Ed.2d 564 (1969). The Board and every arbitrator that had considered the question had also reached the same conclusion. National Grinding Wheel, 176 NLRB 628, 629–30 (No. 89) (1969); Shop Rite Foods, Inc., 58

9. Coca-Cola is not required to process this issue through the grievance and arbitration process because the contract expressly provides that questions concerning the interpretation or enforcement of the no-strike clause are to be determined by resort to the courts rather than through the grievance or arbitration provisions. (PX 1, Art. 16, Section 3).

Lab.Arb. 965 (1972); Michigan Consolidated Gas Co., 54 Lab.Arb. 41 (1969); (see also, Amalgamated Lace Operative, 54 Lab.Arb. 140 (1969); Union Carbide Corp., 46 Lab.Arb. 265 (1965)).

At the same time, the Board, the courts, and at least one arbitrator had held that a no-strike clause which was included in the grievance provisions of a contract or which was directly tied to arbitrable matters, did not bar economic sympathy strikes. Keller-Crescent Co., 217 NLRB 685 (No. 100) (1975), enforcement denied, 538 F.2d 1291 (C.A. 7, 1976); Gary Hobart Water Corp., 210 NLRB 742 (No. 87), enforced, 511 F.2d 284 (C.A. 7, 1975); Kellogg Company, 189 NLRB 948 (No. 123), enforced, 457 F.2d 519, 520, 526 (C.A. 6, 1971); Sears, Roebuck & Co., 35 Lab.Arb. 757, 778 (1960).[10] Thus, at the time the contract was executed there was an established distinction in the case law between broad, independent no-strike clauses and more limited, dependent no-strike clauses.[11] It seems likely, therefore, that the parties intended to bar economic sympathy strikes when they included a broad, independent no-strike clause in their contract at the time it was executed.

■ Finally, any doubt as to the intent of the parties is dispelled by consideration of the collateral evidence in this case. Neither party offered any evidence as to the history of the negotiations that led up to the contract. Evidence was offered, however, as to statements that were made by the parties both prior to and during the period of the strike. First of all, there was evidence that Coca-Cola warned Mr. Sheeran in April of 1977 that the P & M employees would be breaching their contract if they went out on strike in support of the drivers' economic demands; and that Mr. Sheeran replied, "I don't care." (Tr. 11–12, 58–59, 86–87). There was also evidence that both Coca-Cola and the Union steward for the P & M employees told the P & M employees, just prior to the strike, that if they refused to cross the drivers' picket line they would be breaching the contract. (Tr. 13, 22, 119, 122, 123). In addition, there was evidence that the Eastern Conference sent a telegram to the Union during the course of the strike, which stated that the P & M employees should go back to work because they were violating the contract. (Tr. 80–81, 104–105). All of that evidence demonstrates that both parties interpreted the No-Strike clause as a bar to economic sympathy strikes.[12] Such evidence is a persuasive indication of what the parties intended when they made the agreement. The Hearst Corp., 161 NLRB 1405, 1416

---

10. In a more recent opinion an arbitrator rejected that distinction and held that an economic sympathy strike is barred by an express no-strike clause which is tied to arbitrable matters. See, Westinghouse Transport Leasing Corp., 69 Lab.Arb. 1210 (1977).

11. The Board has subsequently taken the position that the Keller-Crescent and Gary Hobart decisions overruled National Grinding Wheel "sub silentio". Davis-McKee, Inc., 238 NLRB (No. 58), 99 LRRM 1307, 1309 (1978). At the time the contract in this case was executed, however, it was not apparent that such a "sub silentio" overruling had occurred. In both Gary Hobart and Keller-Crescent the Board merely held that a no-strike clause which is clearly limited to strikes over arbitrable disputes is not a bar to an economic sympathy strike. The reasoning of those decisions was that the dispute which causes an economic sympathy strike is not arbitrable, and therefore if the union only promises to refrain from striking over arbitrable disputes it would not be barred from engaging in an economic sympathy strike. Obviously, that reasoning doesn't apply to cases in which the Union's no-strike promise is more general and is not limited to strikes over arbitrable disputes. At the time those opinions were issued, therefore, there was no reason to believe that the Board was overruling its earlier decision with regard to a broad no-strike clause which was not limited to arbitrable matters. Moreover, in a decision which was issued after both Keller-Crescent and Gary Hobart, and before the contract in this case was signed, the Board again cited National Grinding Wheel as valid law. RKO General, Inc., 223 NLRB 959, 960 (No. 142) (1976). At the time the contract was signed, therefore, it appeared that the Board was adhering to the established distinction between broad, independent no-strike clauses and more limited, dependent no-strike clauses.

12. Mr. Sheeran did testify that he did not believe that the No-Strike clause barred sympathy strikes. (Tr. 81, 93). The Court, however, does not credit that testimony. See n. 8 supra.

(No. 113), *enforced sub. nom., News Union of Baltimore v. NLRB*, 129 U.S.App.D.C. 272, 276–77, 393 F.2d 673, 677–78 (1968); *see also, Keller-Crescent, supra*, 217 NLRB at 692; *Kellogg Company, supra*, 189 NLRB at 949. The Court, therefore, concludes that the No-Strike clause did bar economic sympathy strikes and consequently the P & M employees' strike was illegal under the Contract. The only question that remains, therefore, is the amount of damages, if any, to which Coca-Cola is entitled.[13]

## IV. DAMAGES

■ Coca-Cola seeks to recover the out-of-pocket expenses it incurred, and the profits it allegedly lost as a result of the strike. (Docket Item 57, p. 14). Such expenses and losses are recoverable in a Section 301 action if they could have been foreseen as the probable result of a breach at the time the contract was made, and if they are proved to a "reasonable certainty." *Eazor, supra*, 520 F.2d at 966–68. In this case the Union does not contend that the damages claimed by Coca-Cola were not foreseeable. Rather, it claims that Coca-Cola has failed to prove its damages to a reasonable certainty. The Court, therefore, will review the evidence produced by Coca-Cola in support of each of its damage claims.

■ The first claim advanced by Coca-Cola is for the wages it paid to the people who replaced the P & M employees during the strike. In support of that claim Coca-Cola introduced testimony that management personnel from other Coca-Cola operations came to the Wilmington plant on the fourth day of the strike to take the place of the P & M employees. (Tr. 16, 28). There was also testimony that six other persons were hired as replacement workers at the same time. (*Id.*) Finally, Terry Williams, the chief financial officer for Coca-Cola's parent corporation, testified that the replacement workers were paid a total of $11,648.41 for their services during the strike. (Tr. 40–41). The Union did not object to this evidence when it was offered and it did not offer any evidence to rebut it. The Court, therefore, finds that Coca-Cola has proved its replacement wage expenses to a reasonable certainty.[14]

The Union contends, however, that Coca-Cola is not entitled to recover the entire amount that was paid to the replacement workers. It contends that the amount claimed for the wages paid to the replacement workers must be reduced by the amount that Coca-Cola saved as the result of not having to pay the P & M employees

---

13. The Union contends that the Supreme Court's decision in *Buffalo Forge v. United Steel Workers of America*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), and the Third Circuit's decision in *United States Steel Corp. v. United Mine Workers*, 548 F.2d 67 (1976), *cert. denied*, 431 U.S. 968, 97 S.Ct. 2926, 53 L.Ed.2d 1063 (1977), somehow preclude this Court from assessing damages against a Union which engages in a sympathy strike. (Docket Item 59, pp. 9–11). The Court does not agree. *Buffalo Forge* held only that an injunction could not issue against a sympathy strike where the strike was not over an arbitrable issue. *Buffalo Forge, supra*, 428 U.S. at 407, 96 S.Ct. 3141. It did not hold that damages could not be awarded against a union which engaged in such a strike. In fact, it assumed that damages might be awarded against a union as the result of a sympathy strike if it were ultimately found that the strike was in violation of the Union's contract. *Buffalo Forge, supra*, at 405, 96 S.Ct. 3141. *U. S. Steel*, on the other hand, held only that a sympathy strike is not normally a violation of a collective bargaining agreement which contains only an *implied* no-strike clause. *U. S. Steel, supra*, at 69, 74; *but see United States Steel Corp. v. United Mine Workers*, 593 F.2d 201 (C.A. 3, 1979). It did not hold that such strikes could not be found to be in violation of a collective bargaining agreement which contains an *express* no-strike clause. In fact, Judge Garth's concurring opinion in *U. S. Steel* specifically stated that a violation might be found in such a case and that damages could be awarded. *U. S. Steel, supra*, at 75.

14. The Union contended in its post-trial brief that Coca-Cola has somehow failed to prove its replacement wage expenses to a reasonable certainty because it did not offer documentary evidence of those expenses. (Docket Item 59, pp. 15, 16). That contention is meritless. Under the Federal Rules of Evidence a party may prove the fact and the amount of a payment without producing the written records of that payment. *See*, Advisory Committee's Note to Rule 1002, F.R.Evid.

during the strike. (Docket Item 59, p. 16). The Court agrees. It is a fundamental principle of damage law that an injured party's damages must be reduced by the amount that he saved as a result of the breach. 5 Corbin on Contracts § 1038 (1964). *See also, Cook Industries, Inc. v. Carlson,* 334 F.Supp. 809, 816 (N.D.Miss.1971). In this case the Union introduced evidence that Coca-Cola saved a total of $6,436.80 in wage expenses as the result of not having to pay the P & M employees during the strike. (DX 2, Answer to Interrogatory 1). The Court, therefore, concludes that Coca-Cola is entitled to recover a total of $5,211.71 for its increased wage costs during the strike period.

■ The balance of Coca-Cola's claims relate to the loss of production that occurred during the strike. Elbert F. Jones, the general manager of the Wilmington plant at the time of the strike, testified that Coca-Cola determined its monthly production schedule by means of a "sales forecast." (Tr. 19). The sales forecast in turn was based on the Company's sales performance during the same period in prior years and on any recent sales trends that had developed. (Tr. 19–20, 70). Mr. Jones also testified that during the eight day period of the strike the P & M employees were scheduled to produce a total of 56,000 cases of various types of soda. (Tr. 18). He further testified that the replacement workers who manned the production line during the strike were not able to meet that schedule. According to Mr. Williams' testimony the replacement workers' total production during the period of the strike amounted to 21,890 cases. (Tr. 18, 51). The claimed production loss during the strike, therefore, was 34,110 cases. (Tr. 51).

Mr. Williams then testified as to the manner in which he determined Coca-Cola's total dollar losses as a result of that decreased production. He testified that he first broke down the 34,110 figure into the various types of items that were not produced. (Tr. 36, 51–52). The itemized loss in production was as follows:

| | | | | | | |
|---|---|---|---|---|---|---|
| a. | 6.5 oz. | Returnable Coke | | – | 4,488 | cases |
| b. | 10 oz. | " | " | – | 3,111 | " |
| c. | 16 oz. | " | " | – | 4,400 | " |
| d. | 10 oz. | Non-Returnable Coke | | – | (1,476) | " [15] |
| e. | 16 oz. | " | " " | – | 4,736 | " |
| f. | 10 oz. | Returnable Sprite | | – | 640 | " |
| g. | 16 oz. | " | " | – | 240 | " |
| h. | 10 oz. | Non-Returnable Sprite | | – | 2,124 | " |
| i. | 16 oz. | " | " " | – | 628 | " |
| j. | 10 oz. | " | " Tab | – | 3,799 | " |
| k. | 16 oz. | " | " " | – | 1,440 | " |
| l. | 10 oz. | " | " Fanta | – | 4,361 | " |
| m. | 10 oz. | " | " Mr. Pibb | – | 589 | " |
| n. | 10 oz. | " | " Dr. Pepper | – | 1,280 | " |
| o. | 10 oz. | " | " Fresca | – | 731 | " |
| p. | 16 oz. | " | " " | – | 1,296 | " |

(Tr. 51–52). Mr. Williams then took Coca-Cola's net profit figure for each of those items and multiplied it times the lost production figure for that item. (Tr. 36, 55–56). Those calculations produced the following set of figures:

---

**15.** The figure for 10 oz. non-returnable Coke is in brackets because Coca-Cola produced that amount over its schedule for that item. (Tr. 51–52).

| | | Item | Net Profit Figure | Total Loss |
|---|---|---|---|---|
| a. | 6.5 oz. | Returnable Coke | $ 2.4986 | $11,213.72 |
| b. | 10 oz. | Returnable Coke | 2.366 | 7,360.63 |
| c. | 16 oz. | Returnable Coke | 2.6883 | 11,828.52 |
| d. | 10 oz. | Non-Returnable Coke | 1.9793 | (2,921.45) |
| e. | 16 oz. | Non-Returnable Coke | 1.9967 | 7,459.67 |
| f. | 10 oz. | Returnable Sprite | 2.1764 | 1,392.90 |
| g. | 16 oz. | Returnable Sprite | 2.6384 | 633.22 |
| h. | 10 oz. | Non-Returnable Sprite | 1.9497 | 4,141.16 |
| i. | 16 oz. | Non-Returnable Sprite | 1.9692 | 1,236.66 |
| j. | 10 oz. | Non-Returnable Tab | 1.9203 | 7,295.22 |
| k. | 16 oz. | Non-Returnable Tab | 1.9022 | 2,739.17 |
| l. | 10 oz. | Non-Returnable Fanta | 2.0248 | 8,830.15 |
| m. | 10 oz. | Non-Returnable Mr. Pibb | 2.3851 | 1,404.82 |
| n. | 10 oz. | Non-Returnable Dr. Pepper | 1.9473 | 2,492.54 |
| o. | 10 oz. | Non-Returnable Fresca | 1.5521 | 1,134.59 |
| p. | 16 oz. | Non-Returnable Fresca | 1.878 | 2,693.05 |

(Tr. 55–56). Coca-Cola's total claimed lost profit based on those calculations amounts to $68,934.57. (Tr. 38, 50–51).

Neither Mr. Jones' testimony nor Mr. Williams' testimony was seriously challenged during cross-examination [16] and the Court concludes that the testimony of both men is credible. The Court has concluded, however, that one adjustment must be made to Mr. Williams' calculations.

Mr. Williams' calculations were based on the premise that Coca-Cola had a loss in sales which was equal to its loss in production during the strike. The problem with that premise is that it does not take into account the fact that Coca-Cola made up for part of its lost production by purchasing cases of soda from other Coca-Cola operations. (See Tr. 18, 40). There is nothing in the record that would indicate that those additional cases were not sold. It must be concluded, therefore, that Coca-Cola's total loss in sales was not as large as its total loss in production, but was rather equal to its production loss minus the number of cases purchased from other operations.

Mr. Williams' calculations, therefore, must be adjusted to reflect the profits that were gained on the cases that were purchased from other operations. Unfortunately, it is not possible to make an adjustment at this point that would precisely reflect those profits because there is no evidence in the trial record as to the total number of cases that were purchased.[17]

16. At the conclusion of the trial the Union introduced several of Coca-Cola's answers to interrogatories and it now contends that at least one of those answers is inconsistent with Mr. Williams' testimony. (Tr. 131–33; Docket Item 59, p. 20). The answer the Union relies on, however, deals with a matter that Mr. Williams did not directly testify to and it is therefore not clear whether the answer does conflict with his testimony. (See, DX 2, p. 24). In addition, the Union made no attempt to cross-examine Mr. Williams on that alleged inconsistency during trial. The Court, therefore, has concluded that Mr. Williams' testimony is entitled to more weight than the allegedly inconsistent answer in the interrogatories.

17. Coca-Cola did state the number of purchases that it made in an answer to an interrogatory. (Docket Item 31, Ex. B). That answer,

There is evidence, however, that the purchases were confined to cases of 16 oz. non-returnable Coke and 10 oz. non-returnable Sprite. (Tr. 40). Thus, the Court concludes that the adjustment must be made by deducting the entire lost profits claimed for those two items. Coca-Cola's total lost sales as thus reduced equals $57,333.74.

■ Coca-Cola's final claim for compensatory damages [18] is based on the fact that the purchases discussed above cost it more than the production of the same number of cases would have cost. Mr. Williams testified that the total additional costs to Coca-Cola of those purchases amounted to $5,377.40. (Tr. 40, 42). Once again that testimony was not objected to at the time it was offered and it was not challenged on cross-examination. The Court, therefore, concludes that Coca-Cola proved its added purchase costs claim to a reasonable certainty.

■ The Union also contends that Coca-Cola should be barred from recovering any of its compensatory damages because it failed to take sufficient steps to mitigate its damages. (Docket Item 59, p. 21). The Court does not agree.

In *Eazor*, the Third Circuit Court of Appeals stated:

[W]e think that the doctrine of mitigation of damages has a limited application to situations in which a union or its members have breached a no-strike agreement by carrying on a strike in violation of the agreement.

*Eazor, supra*, 520 F.2d at 969. The Court then went on to hold that as long as the employer acts reasonably it will not be barred from recovering its damages, even though those damages might have been less if it had adopted another course of action. *Id.* at 970–71; *see also, S. J. Groves & Sons Company v. Warner Company*, 576 F.2d 524,

528–530 (C.A. 3, 1978); *In re Kellet Aircraft Corp.*, 186 F.2d 197, 198–99 (C.A. 3, 1950).

In the present case Coca-Cola took several steps in an effort to mitigate its damages. On the first day of the strike Coca-Cola brought its own management people into the plant to man the production line. In the succeeding days they continued to at least partially man the line with new hires and with management people from other Coca-Cola operations. In addition, Coca-Cola also tried to make up for its lost production by purchasing soda from other Coca-Cola operations. Those actions significantly reduced the total amount of damages that Coca-Cola ultimately suffered as a result of the strike.

■ The Union,· nevertheless, argues that Coca-Cola did not act reasonably because it did not formally demand that the inside employees return to work until after the strike had been in progress for seven days. (Docket Item 59, p. 21). The Court does not agree. It is true, as the Union points out, that the Union did tell the inside employees to go back to work shortly after it received a telegram from Coca-Cola which demanded that the inside employees return to work. (Tr. 80). It is, ·therefore, possible that Coca-Cola might have been able to end the strike at an earlier date— and thus avoided most of its damages—if it had made such a demand earlier. At the time the strike began, there was no reason for Coca-Cola to believe that the Union would respond to a demand that they return to work. Mr. Sheeran had been told in April when he first threatened to call a strike that the Company would view such an action as a breach of the contract. Mr. Sheeran had replied at that time that he didn't care. Hence, the Court concludes that Coca-Cola's failure to make an immediate formal demand upon the Union to re-

---

however, was not introduced into evidence and the Court, therefore, may not consider it in reaching its decision. *See Bracey v. Grenoble*, 494 F.2d 566, 570 n.7 (C.A. 3, 1974).

18. Coca-Cola advanced a third production related claim at trial. (Tr. 42–45). The Court

agrees with the Union, however, that the evidence offered in support of that claim was clearly insufficient to establish either the fact or the amount of the claim to a reasonable certainty. (*See*, Tr. 42–45, 71–72).

turn to work was not unreasonable in the circumstances of this case. The Court also concludes that the other actions taken by Coca-Cola in an effort to minimize its damages were reasonable and that the Company is not barred from recovering the damages it has established.

Coca-Cola also seeks an award of punitive damages against the Union. The Court has concluded, however, that punitive damages may not be awarded in a Section 301 action in this Circuit.

In *Local 127 United Shoe Workers v. Brooks Shoe Manufacturing Company*, 298 F.2d 277 (1962), the Third Circuit Court of Appeals reversed a district court decision which had awarded punitive damages against an employer for a breach of a collective bargaining agreement. There were two separate opinions which expressed the view of the majority of the *en banc* court on the punitive damages issue. In the first, Chief Judge Biggs specifically stated that it was his view "that Section 301 . . . does not contemplate the imposition of punitive awards." *Id.* at 284. The second opinion by Judge Kalodner is not quite as clear. He did state, however, that he did not believe that the Supreme Court's decision in *Textile Workers Union of America v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) stood for the proposition that the federal courts could "fashion" a remedy in a Section 301 suit that would embrace punitive damages. *Id.* at 285. The Court reads those two opinions as standing for the proposition that punitive damages may never be awarded in a Section 301 case.[19] *Compare, Sidney Wanzer & Sons, Inc. v. Milk Drivers Union, Local 753*, 249 F.Supp. 664 (N.D.Ill.1966). The Court concludes that Coca-Cola's claim for punitive damages must be denied.

Judgment will be entered in accordance with this Opinion.

**19.** The Company contends in its reply brief that the *Brooks* decision is not in accord with "the current policy trends regarding punitive damages." (Docket Item 61, p. 13). In fact, however, the Supreme Court recently held that punitive damages may never be assessed against a union in unfair representation cases brought under the Railway Labor Act. *International Brotherhood of Electrical Workers v. Foust*, —— U.S. ——, 99 S.Ct. 2121, 2128, 60 L.Ed.2d 698 (1979). The Court thus finds that the "current trend" is in accord with *Brooks* rather than against it.